A10A2309. LOUISYR v. THE STATE.
(706 SE2d 114)

BLACKWELL, Judge.
Karl Max Louisyr was tried by jury and convicted of two counts of aggravated stalking in violation of OCGA § 16-5-91. He now appeals from the denial of his motion for a new trial, asserting that the evidence adduced at trial is insufficient to prove beyond a reasonable doubt that he engaged in a pattern of harassing and

intimidating behavior directed at his victim. Louisyr also contends on appeal that, even if the evidence is sufficient to sustain his convictions, the trial court erred when it failed to merge his convictions for sentencing purposes. We find no merit in either of these claims of error and affirm.

Viewed in the light most favorable to the verdict,[1] the record shows that Louisyr and Guylene Mompremier were married for at least nineteen years[2] and had four children together. Following an incident of domestic violence at their Florida home in June 2007, Mompremier and the couple's three minor daughters left the home and moved to a domestic violence shelter. On June 27, 2007, Mompremier obtained a protective order against Louisyr in Florida, which prohibited him from, among other things, having any type of contact with her or coming within 500 feet of any place she was residing. That order also granted full custody of the couple's minor children to Mompremier and reserved jurisdiction to the Florida court to determine whether Louisyr would be awarded any visitation rights.

Shortly after she obtained the protective order, Mompremier was contacted by Paul Lucot, a family friend who previously had been married to Louisyr's cousin.[3] Lucot explained that he had learned of Mompremier's situation from other family members, who had provided him with Mompremier's cell phone number, and that he wanted to help her and her children. He said that he had a four-bedroom house in Georgia, and he invited Mompremier and her children to stay with him. When Mompremier asked if Lucot was acting in concert with her husband, Lucot insisted that he had not had any contact with Louisyr.

Based on Lucot's assurances that her husband was not involved, Mompremier agreed to relocate with her children to Georgia. Thus, in late July 2007, Lucot went to Florida, picked up Mompremier and the children from the domestic violence shelter, and drove them to Georgia. When they arrived in Gwinnett County, however, Lucot took the mother and children to a local hotel, rather than to his home. He explained that Mompremier and her daughters would stay at the hotel for a night, before they moved into his residence. Lucot then went into the hotel to check into the room, leaving Mompremier and the children in the car. He returned with two keys to the hotel room, one of which he gave to Mompremier and the other of which he

---

[1] See *Cutrer v. State*, 287 Ga. 272, 274 (695 SE2d 597) (2010).

[2] At the time of the trial in February 2008, the couple had been married 19 years, but Mompremier had initiated divorce proceedings.

[3] At the time Lucot contacted her, Mompremier believed that Lucot still was married to Louisyr's cousin. She subsequently learned that the couple had divorced several years before.

YALE LAW LIBRARY

insisted on keeping.

Lucot left the hotel at approximately 10:00 that evening, and Mompremier and the children remained in their hotel room. About two hours later, the desk clerk called the hotel room and spoke with Louisyr's oldest daughter, who answered the phone. The clerk told the daughter that a "friend" was on his way to the room to see "you," which the daughter understood to mean the people in the room. Because she believed that no one other than Lucot knew they were at the hotel, the daughter asked for the friend's name, and the clerk responded "Karl Max Louisyr." Realizing that her father was in the hotel, the daughter woke Mompremier and immediately telephoned the police.

Louisyr came to the room, knocked on the door, and called his oldest daughter's name. When no one inside the room responded, Louisyr used a key and tried to enter the room. His attempt to open the door was thwarted by the safety chain, so Louisyr reached his hand inside and attempted to remove it. Mompremier and the oldest daughter, however, pushed against the door and prevented Louisyr from gaining entry. Louisyr then returned to the hotel lobby, where police eventually arrested him for violating the protective order. Louisyr was indicted on two counts of aggravated stalking, one based on his conduct in following Mompremier to the hotel, and the other based on him making contact with her when he attempted to enter her hotel room.

At trial, Mompremier testified that, during the domestic violence incident that led to the protective order, Louisyr had assaulted her, pulled a machete on her, and threatened to cut off her head. Thus, when he arrived at the hotel on the night in question and tried to force his way into her room, she believed Louisyr was there to harm her. She further explained that she had never initiated contact with Louisyr, had never consented to contact with him, and had not agreed to allow the children to see him. As far as she knew, Lucot was the only person who knew that she and the children were staying in that hotel.

Louisyr testified in his own defense and explained that he had come to Georgia from a family reunion in Indiana, riding with two cousins who lived in Gwinnett County. One of those cousins previously had been married to Lucot. Both cousins testified that they had attended the family reunion in Indiana with Louisyr, at which time he had expressed an interest in coming back to Georgia and visiting with them. He then rode with the cousins to Georgia, rather than returning to his home in Florida. During the car trip, the cousins observed Louisyr having one or more conversations on his cell phone, but they did not pay attention to what was being said. Once they arrived in Georgia, Louisyr asked the cousins if they could take him

to the hotel in question, and explained that he planned to meet his children there.

According to Louisyr, he had spoken to Lucot approximately one week before attending the family reunion, and the men had agreed that Lucot would bring Mompremier and the children to the hotel in Gwinnett County on the day in question, where Louisyr would join them. After making this plan, Louisyr called the hotel and reserved a room in his name. The hotel owner testified that the room in question had been reserved in Louisyr's name and guaranteed with Louisyr's credit card.[4]

Louisyr gave conflicting testimony as to the purpose of his planned meeting at the hotel with Mompremier. Early in his testimony, Louisyr stated that his wife had communicated with Lucot and another cousin (who was also the couple's pastor) and explained that, while she would not meet with Louisyr in Florida, she was willing to meet with him in Georgia. Thus, he stated that he had reserved the hotel room and traveled to Georgia for the express purpose of meeting with Mompremier. He subsequently testified that he had gone to the hotel for the sole purpose of seeing his children and to pay for the room and that he did not expect to see his wife there. Louisyr acknowledged, however, that at the time he planned the meeting at the hotel and went to the hotel, he was aware of the protective order and its contents, that he knew the protective order prohibited him from having any contact with his wife or from coming within 500 feet of her residence, and that any contact with his children at the hotel necessarily would involve contact with his wife. Despite his knowledge of these facts, Louisyr obtained a key to his wife's hotel room[5] and, when his wife and children failed to respond to his knocks, he used the key in an attempt to enter the room. And, Louisyr admitted that at the time he attempted to enter the room, he did so with the belief that his wife was in the room.

The jury convicted Louisyr of both counts charged in the indictment, and the trial court sentenced him to ten years' imprisonment on Count 1 and ten years' probation on Count 2, the sentences to run consecutively. Louisyr then filed a motion for a new trial, which was denied. This appeal followed.

1. We first address Louisyr's challenge to the sufficiency of the evidence. When we consider whether the evidence is sufficient to sustain a conviction, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

---

[4] When Mompremier and her daughters checked out of the hotel, the name on the room was changed to Paul Lucot, because Lucot in fact paid the bill.

[5] Louisyr testified that he obtained a room key from the front desk clerk, explaining that the hotel gave him a key because the room was reserved in his name.

could have found the essential elements of the crime beyond a reasonable doubt." (Punctuation omitted.) *Cooper v. State*, 299 Ga. App. 199, 200 (682 SE2d 154) (2009).

> [I]t is the function of the jury, not this Court, to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the evidence. So, if the record contains some competent evidence to prove each element of the crime of which the defendant was convicted, even though that evidence may be contradicted, we must uphold the conviction.

(Citations and punctuation omitted.) *Ferguson v. State*, 307 Ga. App. 232, 233 (1) (704 SE2d 470) (2010).

Under Georgia law, a person commits aggravated stalking when, in violation of a protective order, he "follows, places under surveillance, or contacts another person at or about a place or places without the consent of the other person for the purpose of harassing and intimidating the other person." OCGA § 16-5-91 (a). Thus, to prove that Louisyr committed aggravated stalking, the State was required to prove: (1) that a protective order prohibited Louisyr from engaging in certain conduct with respect to Mompremier; (2) that Louisyr followed Mompremier, placed her under surveillance, or contacted her without her consent; (3) that such an act violated the protective order; and (4) that such an act was done for the purpose of harassing and intimidating Mompremier. See *Burke v. State*, 297 Ga. App. 38, 41 (676 SE2d 766) (2009). On appeal, Louisyr contends that the State failed to prove beyond a reasonable doubt that he did anything for the purpose of harassing and intimidating Mompremier. We find no merit in this contention.

Louisyr relies on *State v. Burke*, 287 Ga. 377 (695 SE2d 649) (2010), in which the Supreme Court of Georgia said that, to prove an act was done for the purpose of harassing and intimidating, the State must show it was part of a "pattern of harassing and intimidating behavior."[6] 287 Ga. at 379. In light of this requirement, and as the Supreme Court explained in *Burke*, "a single violation of a protective order, by itself, does not amount to aggravated stalking." Id. at 378. Louisyr contends, however, that *Burke* not only requires a pattern of harassing and intimidating conduct, but a pattern of violating a

---

[6] This requirement is taken from OCGA § 16-5-90 (a) (1), which provides in relevant part: For the purposes of this article, the term "harassing and intimidating" means a knowing and willful course of conduct directed at a specific person which causes emotional distress by placing such person in reasonable fear for such person's safety or the safety of a member of his or her immediate family, by establishing a pattern of harassing and intimidating behavior, and which serves no legitimate purpose.

protective order. In other words, Louisyr says that proof of a pattern of harassing and intimidating behavior that includes some act in violation of a protective order is not enough. He says instead that the State must prove multiple violations of a protective order. We do not agree.

By its plain terms, OCGA § 16-5-91 prohibits even a single violation of a protective order, if that violation is, as *Burke* explains, part of a pattern of harassing and intimidating behavior. Although *Burke* requires a pattern of behavior, nothing in that opinion suggests that multiple violations of a protective order are required. In determining whether a defendant has exhibited such a pattern of behavior, the jury can consider a number of factors, including the prior history between the parties,[7] the defendant's surreptitious conduct, as well as his overtly confrontational acts,[8] and any attempts by the defendant to contact, communicate with, or control the victim indirectly, as through third parties.[9]

Here, the jury was entitled to find from the evidence adduced at trial that Louisyr arranged for Lucot to contact Mompremier (because Louisyr knew he was prohibited from doing so), that together the men planned for Lucot to lure Mompremier to Georgia with a false offer of assistance, and that the men agreed Lucot would travel to Florida and retrieve Mompremier and her children from the domestic violence shelter for the purpose of driving them to the hotel in Georgia. The jury was also entitled to find that, unbeknownst to Mompremier, Louisyr reserved the hotel room in his name, thereby guaranteeing him access to that room, that Louisyr went to the hotel with the knowledge that Mompremier was there, and that he obtained a key to the room where Mompremier was staying. Finally, the jury was entitled to find that when the people in the room refused to answer the door, Louisyr used his key and attempted to enter the room, and when he was thwarted by the safety chain, he attempted to force his way into the hotel room. The evidence, therefore, was sufficient to prove beyond a reasonable doubt that Louisyr engaged in a pattern of harassing and intimidating behavior, which culminated in a violation of a protective order. See *Daker v. Williams*, 279 Ga. 782, 785 (621 SE2d 449) (2005). ("A 'course of conduct' refers to a series of successive actions, and, as such, is equivalent to a 'pattern of behavior.' ") (interpreting and applying OCGA § 16-5-91).

Louisyr also appears to argue that his testimony — in which he

---

[7] *Thomas v. State*, 276 Ga. App. 79, 80 (1) (622 SE2d 421) (2005); *Johnson v. State*, 260 Ga. App. 413, 414-417 (1) (579 SE2d 809) (2003).

[8] *Owen v. Watts*, 307 Ga. App. 493, 498 (2) (705 SE2d 852) (2010).

[9] *Harvill v. State*, 296 Ga. App. 453, 456 (1) (a) (674 SE2d 659) (2009).

explained that he went to the hotel for the sole purpose of seeing his children and paying for the hotel room — required the jury to find that he did not act for the purpose of harassing and intimidating his wife. This argument, however, ignores the fact that Louisyr gave conflicting testimony about his reasons for going to the hotel, at one point stating that he had gone to the hotel for the express purpose of having contact with Mompremier. In light of this conflicting evidence, it was for the jury to determine whether Louisyr acted for the purpose of harassing and intimidating his wife. *Jackson v. State*, 301 Ga. App. 863, 865 (690 SE2d 195) (2010); *Ford v. State*, 283 Ga. App. 460, 461 (1) (641 SE2d 671) (2007). Moreover, given that Louisyr testified at trial as to the reasons underlying his conduct, it was solely for the jury, viewing that testimony in light of the other evidence, to assess Louisyr's credibility and determine whether his testimony was truthful. *Ferguson*, 307 Ga. App. at 233 (1). See also *Medlin v. State*, 285 Ga. App. 709, 716 (3) (647 SE2d 392) (2007) ("[b]ecause the jury alone is charged with judging the credibility of witnesses, it was entitled to disbelieve [the defendant's] version of the facts"). "And if the jury concluded that his testimony was not truthful, as we must assume it did, the jury was entitled to take his untruthfulness as substantive and affirmative evidence of his guilt." *Ferguson*, supra. The evidence is sufficient to sustain the convictions.

2. We turn next to Louisyr's contention that the trial court should have merged his convictions for purposes of sentencing. As noted above, the aggravated stalking statute prohibits a person from following the victim, placing the victim under surveillance, or contacting the victim in violation of a protective order. See OCGA § 16-5-91 (a). The State alleged, and the jury found, that Louisyr violated the statute in two ways, both by following Mompremier to the hotel and, once there, by making contact with her. Louisyr argues, however, that the trial court was required to merge his convictions for sentencing purposes because the two convictions are based on precisely the same conduct, his going to Mompremier's hotel room. We do not agree.

"The doctrine of merger precludes the imposition of multiple punishments when the same conduct establishes the commission of more than one crime." *McKenzie v. State*, 302 Ga. App. 538, 539 (1) (a) (691 SE2d 352) (2010). See also OCGA § 16-1-7 (a). Whether offenses merge is a legal question, which we review de novo. *Jones v. State*, 285 Ga. App. 114, 115 (645 SE2d 602) (2007). In considering a merger question, the critical issue is "whether, looking at the evidence required to prove each crime, one of the crimes was established by proof of the same or less than all the facts required to establish the commission of the other crime charged." (Citation and

punctuation omitted.) *Middlebrooks v. State*, 289 Ga. App. 91, 93 (1) (656 SE2d 224) (2008). "But, the rule prohibiting multiple convictions does not apply unless the same conduct of the accused establishes the commission of multiple crimes." (Punctuation omitted.) *Chalifoux v. State*, 302 Ga. App. 119, 119 (690 SE2d 262) (2010); see also *Collins v. State*, 277 Ga. App. 381, 382 (626 SE2d 513) (2006) ("The key question in determining whether a merger has occurred is whether the different offenses are proven with the same facts."). "Thus, if the underlying facts show that one crime was completed prior to the second crime, there is no merger. [Cit.]" (Punctuation omitted.) *McKenzie*, 302 Ga. App. at 539 (1) (a).

OCGA § 16-5-91 does not define the term "follow," and the jury was not instructed on the definition of the term.[10] Given that the word "follow" is not a term of art, but instead is a word of common understanding and meaning, we think the term includes a person going to a place to which he knows or believes another has gone and at which the other person may be found. See, e.g., *Hollis v. State*, 295 Ga. App. 529, 532-533 (2) (672 SE2d 487) (2009) (jurors can interpret and apply statutory "words of common understanding and meaning which require no definition themselves for understanding by the jury") (punctuation omitted). See also New Oxford English Dictionary (2d Ed. 2005) (defining "follow" as "to go or come after (a person or thing proceeding ahead); move or travel behind; go after someone in order to observe or monitor them"). Accordingly, there was sufficient evidence from which the jury could find that Louisyr, in violation of the protective order, both followed Mompremier to the hotel and then contacted her. That is, the evidence allowed the jury to find that Louisyr followed Mompremier to the hotel when he asked his cousins to drive him to that location, believing he would find Mompremier there. And the jury was authorized to find that, after following Mompremier to the hotel, he contacted her by knocking on the door of her room and trying to enter it.

Moreover, the act of following was complete at the time Louisyr arrived at the premises of the hotel, went to the front desk, and asked for the key to Mompremier's hotel room. At that time, Louisyr had violated the protective order by coming within 500 feet of a place where his wife was residing. Thus, the act of following was completed before Louisyr attempted to make contact with Mompremier. The convictions for aggravated stalking based on Louisyr's following and his contacting Mompremier, therefore, did not merge for sentencing purposes. *McKenzie*, supra, 302 Ga. App. at 539 (1) (a).

---

[10] Nor is there any evidence that a jury instruction was requested on the definition of the term "follow."

For the foregoing reasons, we affirm the trial court's order denying Louisyr's motion for a new trial.

*Judgment affirmed. Barnes, P. J., and Dillard, J., concur.*

DECIDED FEBRUARY 4, 2011 —

*Sharon L. Hopkins*, for appellant.

*Daniel J. Porter, District Attorney, Kimberly A. Gallant, Latysha M. Saunders, Wesley C. Ross, Assistant District Attorneys*, for appellee.