**SECOND DIVISION**
**BARNES, P. J.,**
**MCFADDEN and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/**

**March 20, 2013**

# In the Court of Appeals of Georgia

A12A2243. NOSRATIFARD v. THE STATE.

MCMILLIAN, Judge.

Shahrokh Nosratifard appeals from the trial court's denial of his motion for a new trial following his conviction on five counts of aggravated stalking based on five text messages sent to Karen Maxie. On appeal, Nosratifard asserts that the evidence was insufficient to support his convictions and further argues that the trial court erred in failing to merge the counts involving texts that occurred as part of a continuous course of conduct or conversation. Because we find that the evidence was sufficient to support Nosratifard's convictions and that his convictions were not subject to merger, we affirm.

"On appeal from a criminal conviction, we view the evidence in the light most favorable to the verdict, with the defendant no longer enjoying a presumption of

innocence." (Citation omitted.) *Reese v. State*, 270 Ga. App. 522, 523 (607 SE2d 165) (2004). This Court neither weighs the evidence nor determines the credibility of witnesses, but rather considers only whether, after viewing the evidence in the light most favorable to the jury's verdict, a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Citation, punctuation and footnote omitted.) *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

So viewed, the evidence at trial showed that Karen Maxie met Nosratifard online in 2004, and they began a relationship. By 2006, Nosratifard "was practically living with [her]." During this time Maxie helped finance Nosratifard's cabinet business. But by 2007, the relationship had deteriorated, and by May 2008, Maxie decided to end the relationship due to Nosratifard's "mental abuse." She said this abuse included possessiveness, watching her home, searching her home without consent, running a background check on her and threatening to distribute intimate pictures of her to her family, co-workers and the community in which she lived. When Maxie told Nosratifard that the relationship was over, he "exploded" and said that he would never let her go.

Although Nosratifard never stayed at Maxie's house again, he called her continuously and "pled and begged and screamed and cussed" for her to give him a second chance. Maxie said she kept talking to him and trying to persuade him that it would be better for them to be friends because she wanted to "do whatever it [took] to keep from provoking him, and I felt like if I got him to be friends that sooner or later he would get the message and leave me alone, but he never did."

On the few occasions when she agreed to meet Nosratifard, the meetings did not go well. One meeting in August 2008 occurred after Nosratifard demanded that Maxie get her belongings from his cabinet shop. Maxie's adult daughter went with her to the shop, and became upset with Nosratifard's treatment of her mother during the meeting. She shook her finger in Nosratifard's face and told him to leave her mother alone. On the way home, Nosratifard called Maxie on her cell phone to complain about her daughter's behavior and to threaten her family. The next day, Maxie and her children discovered that seven tires on their cars had been slashed. Maxie and Nosratifard met later in a public parking lot, and Nosratifard told Maxie that he had slashed the tires on her children's cars. Maxie reported these incidents to the police.

In January 2009, Nosratifard called Maxie repeatedly, screaming, cursing, and demanding that she return everything that he had ever bought for her. Maxie contacted police to report Nosratifard's continuing behavior and subsequently obtained a Temporary Protective Order ("TPO"). On the day she obtained the TPO, Nosratifard called her beginning at 5 a. m. and continued throughout the day, even after the order was issued. Maxie decided to meet Nosratifard at a gas station on the way home from court to give him the things he wanted, hoping that would satisfy him. But he became upset and began tossing things around, so Maxie got in her car and drove away. A few days later, Maxie noticed Nosratifard following her to work at around 4:30 a. m., and she called and asked him to stop. In February 2009, a hearing was held on her request to extend the TPO, but after Nosratifard agreed to leave her alone, the judge denied her request.

The next day, Maxie saw Nosratifard parked in an overlook near her house as she was driving home. He motioned her over, and she stopped because she was afraid of what might happen if she did not. Nosratifard gloated about beating her in court, and told her that she needed to get the TPO cleared from his record, or he was going to show her "what revenge is all about." Later that month, Maxie saw Nosratifard again parked in the overlook. He waved her over, but she did not stop. He followed

4

her, passing three vehicles to get directly behind her, and flashed his lights on and off signaling her to stop. Maxie called 911 to report his behavior. And Maxie felt threatened by Nosratifard's behavior, in February 2009, she installed a security fence, security lights and a camera at her home; she also purchased a gun and a dog.

Maxie and her daughter began shopping in an adjacent county to avoid Nosratifard, but on March 1, 2009, they observed a white truck following them and were able to get the tag number. Police later identified the truck as a vehicle rented by Nosratifard. Two days later, on March 3, 2009, Maxie saw Nosratifard standing beside his truck, which, once again, was parked in the overlook.[1] He tried to wave her over, but she kept driving. When Maxie saw Nosratifard pass a car so he could be directly behind her, she called police. He repeatedly closed in on her car, and she was afraid that he was going to hit her. When they came to a stop light, Nosratifard started to get out of his car, but the light changed to green, and Maxie sped off, taking a left turn from the right lane. Nosratifard pulled beside her car and began shaking his finger and screaming obscenities at her. She pulled into a gas station, and when police

---

[1] Earlier the same day, Maxie's son saw Nosratifard following him when he left school for a work program, although the son was able to lose him when he turned into a school parking lot.

5

arrived Nosratifard was placed under arrest for aggressive driving.[2] Maxie obtained a second TPO the next day. While Nosratifard was in jail, Maxie and her children all changed their cell phone numbers.

Nosratifard posted bond for his release on or about March 9, 2009, and one of the special conditions of his bond order provided:

> The Defendant shall stay away, absolutely, directly or indirectly, by person, telephone, e-mail, messenger or any other means of communication from KAREN MAXIE hereinafter referred to as "victim." That includes, but is not limited to, the victim's home, school, and place of business or routes of travel to or from those locations. **Violations connected with contacting/following the victim may subject the Defendant to a separate prosecution for the felony offense of Aggravated Stalking.**

Although Maxie and her family had been receiving text messages they believed to be from Nosratifard since 2008, they received no texts while Nosratifard was in jail on the driving charge. But after Nosratifard bonded out of jail, Maxie and her children began receiving hang-up calls on their home phone number. They did not recognize the numbers showing on the caller ID from these calls. In addition, they began receiving text messages on their cell phones from numbers they did not recognize.

---

[2] Nosratifard was convicted of this charge in October 2009.

6

Maxie and her children testified that from the spelling, choppy English, certain phrases and the content of the texts, they believed that Nosratifard was sending these texts. For example, one text included the language "we need to talk face to face," which Maxie and her son identified as a phrase Nosratifard used repeatedly. Another text states, "ask your mamy (sic) she knows," and Maxie and her children testified that Nosratifard often referred to Maxie as her children's "mammy" because he thought she babied them. Other texts referred to Maxie's reports to the police , and Nosratifard was aware that Maxie had reported his actions to the police. Another text referred to voice recordings of phone messages from Nosratifard that Maxie had given police.

The police were present when Maxie received some of these texts. Deputy Sheriff Brian Sadler of the Forsyth County Sheriff's Office arrived at Maxie's house at 8:19 p. m. on April 2, 2009,[3] after she notified police that she was receiving harassing phone calls. He observed that Maxie was extremely nervous and frightened. The house phone rang continuously, approximately 10 to 15 times while Sadler was there, and she was receiving the text messages. At 8:32 p. m., she received the text at issue in Count IV, which stated, "I know you will show all off (sic) this text to the

_____

[3] The texts at issue in Counts III and IV were received on April 2.

police but don't because more trouble for you." Because this text referred to the police within minutes after Sadler entered Maxie's house, he became concerned that Nosratifard was keeping the house under surveillance. He called for back up and searched outside, but the police did not locate anyone.

When Investigator Matthew Starr of the Forsyth County Police Department attempted to trace the phone numbers from which the hang-up calls and text messages were sent, he discovered that most of the messages and calls came from prepaid phones,[4] for most of which no provider could be identified, and thus he was unable to connect Nosratifard with any of those phone numbers. However, he was able to trace one of the numbers from the hang-up calls to a pay phone located approximately five to ten minutes from Nosratifard's cabinet shop.

Nosratifrad was arrested on April 28, 2009 and charged with the five counts aggravated stalking, arising out of five text messages sent to Maxie's phone between March 21 and April 15, 2009. Maxie and her children received no further text messages after Nosratifard was arrested on these charges.

---

[4] Starr described a prepaid phone as "basically an untraceable phone," with no means of tracing it through records to a specific individual.

8

1. Nosratifard asserts that the evidence was insufficient to support his convictions because the State produced only circumstantial evidence to prove that he sent the texts and failed to exclude every other reasonable hypothesis except that of his guilt. Nosratifard points to testimony from Maxie's son that in October 2008, he received a large amount of texts and hang-up calls, which he attributed to Nosratifard, but Maxie's son conceded that Nosratifard was at Maxie's house in connection with his cabinet business when some of these calls and texts were received. Nosratifard also points to evidence that two Hispanic males were caught on the security camera slashing the tires on Maxie's and her children's cars in February 2009.[5] He argues that this evidence demonstrates that someone else could have been harassing Maxie and her children.

Nosratifard is correct that "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24–4–6.[6] But "the proved facts need exclude only *reasonable*

_____

[5] Maxie and her children did not recognize the individuals shown on the tape. And Maxie testified that Nosratifard often hired Hispanic workers at his shop.

[6] Although this statute was repealed by Ga. L. 2011, Act. 52, § 2 as of January 1, 2013, it was in effect at the time of Nosratifard's trial. In any event, OCGA § 24-

9

hypotheses—not bare possibilities that the crime could have been committed by someone else." (Citation and punctuation omitted; emphasis in original.) *Prather v. State*, 293 Ga. App. 312, 313 (1) (667 SE2d 113) (2008). And it is well settled that

> questions as to the reasonableness of hypotheses are generally to be decided by the jury which heard the evidence and where the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of guilt, that finding will not be disturbed unless the verdict of guilty is insupportable as a matter of law.

(Citation omitted.) *Robbins v. State,* 269 Ga. 500, 501 (1) (499 SE2d 323) (1998). "The appellate courts have no yardstick by which to ordinarily determine what in a given case is a reasonable hypothesis, save the opinion of 12 jurors of rational mind." (Citation omitted.) *Giles v. State*, 211 Ga. App. 594, 595 (1) (440 SE2d 48) (1993).

To prove that Nosratifard was guilty of aggravated stalking, the State was required to show

> (1) that a protective order prohibited [Nosratifard] from engaging in certain conduct with respect to [Maxie]; (2) that [Nosratifard] followed [Maxie], placed her under surveillance, or contacted her without her consent; (3) that such an act violated the protective order; and (4) that

14-6 of the current evidentiary code contains identical language.

such an act was done for the purpose of harassing and intimidating [Maxie].

(Citation omitted.) *Louisyr v. State*, 307 Ga. App. 724, 728 (1) (706 SE2d 114) (2011). See also 16-5-91 (a).

Nosratifard's March 9, 2009 bond order prohibited him from communicating with Maxie by telephone or any other means. Text messages clearly would be a prohibited form of communication in violation of the bond order, and the texts at issue were sent after the order was issued. Although the State was not able to connect Nosratifard directly to any of the numbers used to send these texts, Maxie and her children testified that the texts contained phrases often used by Nosratifard, references to information known by Nosratifard, and "broken English" similar to that employed by Nosratifard. Moreover, the text messages stopped when Nosratifard was in jail on the driving charge, resumed when he bonded out and stopped completely when he was arrested on the charges in this case. The jury considered the evidence cited by Nosratifard, which related to actions prior to the entry of the bond order, and determined that Nosratifard sent the text messages in this case. Because this finding "is not insupportable as a matter of law or outside the proven facts, we shall not disturb it." (Citations omitted.) *Giles v. State*, 211 Ga. App. at 595 (1).

11

The State was also required to prove that Nosratifard sent the texts for the purpose of harassing and intimidating Maxie. The definition of "harassing and intimidating" in this context is found under the stalking statute, OCGA § 16-5-90 (a) (1), and it involves four factors of its own:

> (1) a knowing and willful course of conduct directed at [Maxie] (2) which causes emotional distress by placing [Maxie] in reasonable fear for her safety (3) by establishing a pattern of harassing and intimidating behavior, and (4) which serves no legitimate purpose. OCGA § 16–5–90 (a) (1).

(Punctuation omitted.) *Burke v. State* 297 Ga. App. 38, 41-42 (676 SE2d 766) (2009). The evidence at trial supported a finding of a long and clear pattern of knowing and willful, harassing and intimidating behavior by Nosratifard directed at Maxie for no legitimate purpose. The text messages themselves, sent on three separate days, establish such a pattern. And this evidence combined with Nosratifard's other threatening behavior and Maxie's testimony that she was so scared she felt compelled to undertake security measures was more than sufficient to establish the last element of the crime of aggravated stalking as to each count of the indictment.

Thus, "[e]ven though there was no direct evidence that defendant committed the crime, we conclude that the evidence meets the standard set forth in *Jackson v.*

12

*Virginia,* 443 U.S. 307 (99 SCt 2781, 61 LE2d 560), in that a rational trier of fact could find proof of guilt beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis." (Citation omitted.) *Giles v. State*, 211 Ga. App. at 595-596 (1).

2. Nosratifard also argues that the trial court should have merged Counts I, involving a text sent on March 21, 2009 at 6:56 p. m., with Count II, involving a text sent the same day at 7:18 p. m., for sentencing because they "are part and parcel of the same criminal act." He makes the same contention as to Count III, involving a text sent April 2, 2009 at 7:08 p. m., and Count IV, involving a text sent the same day at 8:32 p. m., because he asserts that they were sent as part of an ongoing conversation that began at 6:43 p. m. that day.[7]

"The doctrine of merger precludes the imposition of multiple punishments when the same conduct establishes the commission of more than one crime. Whether offenses merge is a legal question, which we review de novo." (Citations and punctuation omitted.) *Louisyr v. State*, 307 Ga. App. at 730 (2). But even if we were to assume that the texts sent on the same day were part of a continuous course of

---

[7] The text message in Count V was sent on April 15, 2009 at 7:53 p. m., again at 7:56 p. m. and again at 9:09 p. m.

13

conduct, merger would not necessarily be required under the facts of this case.

Rather, "whether a course of conduct can result in multiple violations of the same statute . . . requires a determination of the 'unit of prosecution,' or the precise act or conduct that is being criminalized under the statute." (Footnotes omitted.) *State v. Marlowe*, 277 Ga. 383, 384 (1) (589 SE2d 69) (2003).[8] "Accordingly, the starting point must be the statute itself." Id.

OCGA § 16-5-91 (a) provides:

A person commits the offense of aggravated stalking when such person, in violation of a bond to keep the peace posted pursuant to Code Section 17-6-110, temporary restraining order, temporary protective order, permanent restraining order, permanent protective order, preliminary injunction, good behavior bond, or permanent injunction or condition of pretrial release, condition of probation, or condition of parole in effect prohibiting the behavior described in this subsection, follows, places under surveillance, or contacts another person at or about a place or places without the consent of the other person for the purpose of harassing and intimidating the other person

---

[8] "Because the instant case does not involve two distinct statutory provisions, the 'required evidence' test does not apply." (Citation omitted.) *Smith v. State*, 290 Ga. 768, 773 (3) n. 4 (723 SE2d 915) (2012). See also *Drinkard v. Walker*, 281 Ga. 211 (636 SE2d 530) (2006).

14

Based upon the plain language of the statute, the prohibited conduct is following, placing under surveillance, or contacting another person without consent in violation of one of the enumerated orders or conditions for the purposes of harassing or intimidating that person. Thus, under the facts of this case, the unauthorized act of contacting Maxie in violation of the condition of the bond order forms the proper "unit of prosecution" under OCGA § 16-5-91 (a). This interpretation is consistent with this Court's prior decisions holding that "[e]ven a single violation of a [bond] order may violate OCGA § 16-5-91 (a) if that violation is part of a pattern of harassing and intimidating behavior." *Brooks v. State*, 313 Ga. App. 789, 792 (1) (723 SE2d 29) (2012), citing *Louisyr v. State*, 307 Ga. App. at 729 (1) (rejecting argument that aggravated stalking requires a pattern of violating a protective order).

Nosratifard points to nothing in the record to indicate that the texts at issue in Counts I and II, sent on March 21, were part of any ongoing conversation with Maxie or anyone else. Rather, they represent two separate contacts with Maxie in violation of the special condition in his bond order, and the trial court correctly refused to merge them.

Although the evidence does demonstrate that the text messages referenced in Counts III and IV are two of fifteen texts sent to Maxie on April 2, we find that they

15

are separate contacts in violation of the aggravated stalking statute. The record shows that Nosratifard initiated the contact on April 2 to both Maxie and her daughter, who were sitting beside each other when they received the text. That text read simply, "What's up?"and the daughter decided to respond on her phone to try to get Nosratifard to incriminate himself. Maxie testified, however, that she did not respond to any of the texts because she was too afraid. As the exchange of texts progressed, Nosratifard was apparently on notice that the person responding was not Maxie because at 6:52 p. m., he directed the other person to "ask your mamy[;] she knows," although some of the other texts in the conversation appear to be directed to Maxie. The evidence indicates that Nosratifard sent the text message at issue in Count III at 7:08 p. m. to both Maxie and her daughter.[9] Nosratifard and Maxie's daughter continued exchanging messages until the last message came from Nosratifard at 8:55 p.m.

The evidence also shows that Nosratifard separately sent the text message at issue in Count IV, which referenced the police, to Maxie at 8:32 p. m. while Deputy

[9] That text read, "I want to help you trust me. I am not that scarry (sic) am I?" Maxie felt the use of the word "scary" also helped Maxie identify Nosratifard as the sender because he used to tell her that people found him scary, and she also used to tell him that he had scary facial expressions.

Sadler was there. And that text does not appear in the text messages taken from the daughter's phone. The evidence supports a finding, therefore, that the text message in Count IV was not part of any ongoing conversation, but was a separate and independent contact with Maxie. Thus, each of the texts at issue constituted a separate violation of Nosratifard's bond order and each supported a separate charge of aggravated stalking.

Accordingly, we find no error in the trial court's decision not to merge any of the counts for sentencing. See *Louisyr v. State*, 307 Ga. App. at 731 (2) (merger not required for one count of aggravated stalking based upon defendant's following victim to hotel and second count based upon his attempt to enter her hotel room in violation of protective order). See also *Smith v. State*, 290 Ga. 768, 773-774 (3) (723 SE2d 915) (2012) (finding no merger required for five counts of attempting to elude a police officer where defendant led police "on a dangerous high speed chase after being given clear signals by five separate police vehicles to stop" because unit of prosecution under OCGA § 40-6-395 was act of fleeing from an individual police vehicle or officer after being given the signal to stop by that vehicle or officer); *Ledford v. State*, 289 Ga. 70, 71-72 (1) (709 SE2d 239) (2011) (three counts of aggravated battery did not merge where each count was predicated on a different

17

injury and thus different conduct by the defendant and testimony of pathologist showed that each injury was caused by separate blows to the victim's body); *Eskew v. State*, 309 Ga. App. 44, 48-49 (3) (709 SE2d 893) (2011) (no merger required for two counts of aggravated battery where one count charged defendant with violently shaking six-month old baby and second count charged defendant with fracturing his skull where expert testified that there must have been some kind of impact to the child's head in addition to the shaking to account for the fractured skull). Compare *Gonzales v. State*, 298 Ga. App. 821, 824 (1) (681 SE2d 248) (2009) (merger required for two counts of aggravated battery arising out of single act of pushing victim out of a moving car); *McKee v. State*, 275 Ga. App. 646, 651 (5) (621 SE2d 611) (2005) (criminal conduct constituted a single course of conduct spanning several days, not a separate offense of child cruelty for each day, where unit of prosecution was causing a child excessive physical or mental pain and statute did not define crime temporally).

*Judgment affirmed. Barnes, P. J., and McFadden, J., concur.*