**FIRST DIVISION**
**GOBEIL and MARKLE, J.J.,**
**and SENIOR APPELLATE JUDGE PHIPPS.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**April 8, 2021**

# In the Court of Appeals of Georgia

A21A0169. FRILANDO v. THE STATE.

PHIPPS, Senior Appellate Judge.

Following a jury trial, John Anthony Frilando was convicted of two counts of aggravated stalking. Frilando filed a motion for new trial, which the trial court denied. On appeal, Frilando contends that the trial court erred by denying his motion for a directed verdict of acquittal because the evidence was insufficient to sustain his convictions. He also contends that the trial court erred by admitting certain evidence, excluding other evidence, and sentencing him as a recidivist under OCGA § 17-10-7 (c). We disagree and affirm.

The standard of review for the denial of a motion for directed verdict of acquittal is the same as that for reviewing the sufficiency of the evidence to support a conviction. Under that standard we view the evidence in the light most favorable to the jury's verdict and determine

whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Conflicts in the testimony of the witnesses, including the state's witnesses, are a matter of credibility for the jury to resolve.

*Brooks v. State*, 313 Ga. App. 789, 790 (723 SE2d 29) (2012) (citation omitted).

So viewed, the evidence shows that Frilando and R. L. were married in 1992. Several years later, Frilando was sentenced to a prison term of twenty years, and he went to prison in February 1997. R. L. maintained contact with Frilando the first few years he was in prison. In 1998 or 1999, R. L. ceased communications with Frilando, but he continued to attempt to contact her through letters and telephone calls. Frilando made multiple telephone calls to the nursing home where she worked and to the owner of the nursing home's house. Frilando also sent R. L. numerous letters; R. L. never responded.

In 2003, R. L. moved from South Carolina to Georgia. A few years later, Frilando filed for divorce from R. L. R. L. testified that she did not file for divorce earlier because she did not want Frilando to know where she lived. R. L. stated she felt scared because Frilando had previously sent someone to her mother's home to harass her mother. Frilando and R. L.'s divorce was finalized in 2007. In 2008, R. L. married K. R.

Following their divorce, Frilando continued to contact R. L. Frilando sent letters to R. L.'s home, her mother's home, her nephew's home, and her place of employment. R. L. saved some of the letters from Frilando, which were entered into evidence. One letter from 2008 reads, in part: "I was thinking of that time, and was wondering How would things would have been different had you died! Wondering would it have been better for me, or what? Because it could not have been no worst! You don't mind if I call you Rotten Bottom? Well you know I don't care anyway." Frilando alleged that R. L. had too many abortions. He continued, "I feel messed up because I always chilled with my moms for holidays, [until] you came around now you get to be with your no good ass mom's while my moms is in a grave! But you will feel the same way I do, when she goes!"

In a letter to R. L. from January 2010, Frilando wrote:

Ask yourself why could you not hold or have a baby? . . . [N]ow you want to run off with my things and bank on this time. I never wanted for us to be like this, but you look at how you played your hand. Right now you think that what you did is cool, and who ever this [K. R.] is he is just someone who happen to get at you at the time that you was fucked up and guess he told you the things you wanted to hear. . . . And just like [P's mom] died a messed up way, so will yours for being down with you, never would I have thought that a mother would pimp out her own girl. You two played a nice game but it will come to an end, and that

3

will be when she dies because you will be lost, and I guess that will be enough for me. You will begin to see that for how you did me this will come back 10xs. I wish I could see your face, I can't believe that we was once so strong together or was that part of your game? Damn life is crazy. Hope you understand that you fucked up as well.

In a January 2013 letter, Frilando told R. L.:

All I want to bring to your attention is that I will be coming home soon and you and me can settle this between us or you can deal with my sister. You was left in charge of all my things [R. L.] I will be coming home to nothing. So do you want us to be in conflict? Or do you want us to move on in life? You know that no man you ever had has done for you like I have. So now if you wish to play me like some lame then you know that you will have to deal with a bunch of Bullshit as well.

The letter ended, "Remember [R. L., I] gave you a life that no other man gave you. Now you must give [me] back [my] life."

K. R. testified that he too received letters from Frilando and, apparently, from Frilando's friends. One letter K. R. received from Frilando, dated in 2007, read, in part:

So this tells me two things either [you're] related to [R. L.] or you was fucking around with her.! Now [K. R.] this is the deal, if [you're] a man, then you will understand why this is coming to you,this crazy bitch ran off with my things and sold my house. . . . See everything she has is

4

because of me and like since I'm no hater life goes on and I don't want to stop no one from living! But no one will stop me from living either.

Around 2007, Frilando filed a lien on a house that K. R. had purchased in Georgia. In a January 2009 letter to R. L., Frilando told her about the lien: "Well I will know if you got this letter because if so you might want to respond. I put a lien on the house at [address] and on you and K. R., and [I'm] willing to remove it and just wish you a happy life. However, you must come clean. You know that what you have done is like dead wrong, and we need to make peace." Frilando claimed that R. L. and K. R. bought the house with money from the sale of Frilando and R. L.'s house in South Carolina. R. L. testified that this was untrue, and K. R. purchased the house with his own money. In June 2014, the Superior Court of Chatham County entered an order voiding the lien filed by Frilando. The order included a no-contact provision: "Should the plaintiff, John A. Frilando, be released from Federal custody he is restrained and enjoined from contacting either Defendant [R. L. or K. R.] or coming within 500 [ ] yards of either of them."

After the no-contact order was issued, Frilando continued to send letters to R. L., both directly and through her attorney. In February 2016, Frilando sent a letter to the human resources department at R. L.'s place of employment. The letter purported

5

to be from the Drug Enforcement Administration, indicated that R. L. was under investigation for drug conspiracy, and requested that R. L. be relieved of her position with her employer. R. L. testified that she felt threatened and "ashamed that I associated with somebody like that."

In February 2016, R. L. contacted Frilando's sister and asked her to tell Frilando to stop writing letters to R. L.'s employer. R. L. also talked to Frilando's sister about Frilando's upcoming release from prison. R. L. told Frilando's sister that she wanted Frilando to get part of the money she received from the sale of their South Carolina house. R. L. had received approximately $24,000 from the sale of the house, and she wanted to give Frilando $12,000. Shortly before Frilando was released from prison, Frilando's sister emailed R. L. to coordinate sending the money to him.

Prior to Frilando's scheduled release date in July 2016, R. L. had a surveillance system installed in her home because she was worried that Frilando would come to her house. After he was released, Frilando continued to contact R. L. by telephone and letter. R. L. testified that he called her at her office "a lot." In a letter to R. L. dated October 2016, Frilando wrote:

> It was crazy that you thought you were being harassed. . . . I was just trying to let you know that I plan on getting me a place in Jan. I was

giving plenty of time to hit me off in Jan with a little extra! Plus, you keep talking this talk about come and see you that you going to get down. . . . Me I am cool if I come to see you it is not what you want. I don't want no problems, unless they are called for.

On December 23, 2016, Frilando went to R. L. and K. R.'s home and rang the doorbell. R. L. looked out her window and saw Frilando. She had no idea why he was there and felt intimidated and scared. Although Frilando said he was there to tell R. L. to send the money from the sale of the house to his sister instead of to his cousin, R. L. testified that he had no reason to be there because she was in contact with his sister. K. R., worried for his wife's safety, grabbed his gun when he saw Frilando at their door. K. R. testified that there was no physical confrontation because they did not open the door. R. L. asked Frilando to leave, and he did. She then called the police.

Frilando was subsequently indicted for and convicted of two counts of aggravated stalking for violating the permanent injunction in the Chatham County Superior Court order by unlawfully contacting the two victims at their home without their consent for the purpose of harassing and intimidating them. Frilando filed a motion for new trial, which the trial court denied after a hearing. This appeal followed.

7

1. Frilando contends that the evidence was insufficient to support his convictions of aggravated stalking. We do not agree.

Under OCGA § 16-5-91 (a),

> [a] person commits the offense of aggravated stalking when such person, in violation of a . . . permanent injunction . . . contacts another person at or about a place or places without the consent of the other person for the purpose of harassing and intimidating the other person.

Although the aggravated stalking statute does not define "harassing and intimidating," the term is defined in the simple stalking statute as "a knowing and willful course of conduct directed at a specific person which causes emotional distress by placing such person in reasonable fear for such person's safety or the safety of a member of his or her immediate family, by establishing a pattern of harassing and intimidating behavior, and which serves no legitimate purpose." OCGA § 16-5-90 (a) (1). "Overt threats of bodily harm are not required." *Phillips v. State*, 278 Ga. App. 198, 199 (1) (628 SE2d 631) (2006) (citation and punctuation omitted).

While a single violation of a protective order, standing alone, does not establish the "pattern of harassing and intimidating behavior" required for aggravated stalking, *State v. Burke*, 287 Ga. 377, 378-379 (695 SE2d 649) (2010), it is well settled that even a single violation of a protective order can constitute aggravated stalking if that

8

violation is part of a pattern of harassing and intimidating behavior. *Oliver v. State*, 325 Ga. App. 649, 652 (1) (753 SE2d 468) (2014).

> In determining whether a defendant has exhibited such a pattern of behavior, the jury can consider a number of factors, including the prior history between the parties, the defendant's surreptitious conduct, as well as his overtly confrontational acts, and any attempts by the defendant to contact, communicate with, or control the victim[s] indirectly, as through third parties.

*Louisyr v. State*, 307 Ga. App. 724, 729 (1) (706 SE2d 114) (2011) (citations omitted).

Frilando argues that the State has not shown a pattern of harassing and intimidating behavior or the lack of a legitimate purpose for his contact with the victims because he went to the victims' house for the legitimate purpose of clarifying where R. L. should send money that she felt she owed him. Consistent with this argument, Frilando testified that he went to the victims' house to tell R. L. to send the money to his sister instead of to his cousin. However, R. L. testified that Frilando had no reason to be there because she was in contact with his sister. Thus, Frilando's intent in going to the victims' house was for the jury to determine. *Davidson v. State*, 295 Ga. App. 702, 705-706 (673 SE2d 91) (2009). Although Frilando denies that he

9

went to the victims' house with an intent harass or intimidate them, "intent is a question of fact to be determined by the jury upon consideration of [Frilando's] words, conduct, demeanor, motive and all other circumstances connected with the act for which the accused is prosecuted." *Holmes v. State*, 291 Ga. App. 196, 198 (1) (661 SE2d 603) (2008). The jury did not have to find Frilando's purportedly legitimate reason for being at the victims' house to be credible. See *Oliver*, 325 Ga. App. at 653 (2) (trier of fact not required to believe defendant's testimony that she arrived at her mother's house in violation of protective order for purpose of seeking medical help).

Furthermore, in determining whether Frilando had exhibited a pattern of harassing and intimidating behavior, the jury was authorized to consider evidence of Frilando's prior behavior toward the victims, including his calls and the letters that he sent to the victims directly and through third parties. See *Louisyr*, 307 Ga. App. at 729 (1). The evidence was sufficient for the jury to find that Frilando's violation of the court order was a continuation of a pattern of harassing and intimidating behavior without a legitimate purpose. See *Brooks*, 313 Ga. App. at 792 ("Even if his messages to the victim were not overtly threatening, given the history of [the defendant's] persistent actions, and his refusal to leave the victim alone, a rational

10

jury could have found beyond a reasonable doubt that such acts were intended to harass and intimidate and placed the victim in fear for her safety.") (citations and punctuation omitted).

2.    Frilando next contends that the trial court erred in allowing evidence of contacts prior to the effective date of the no-contact order. We disagree.

Citing OCGA §§ 24-4-402 and 24-4-403, Frilando argues the evidence of letters prior to the no-contact prohibition was not relevant and was unduly prejudicial. "But decisions regarding relevance are committed to the sound discretion of the trial court, and the exclusion of relevant evidence under Rule 403 is an extraordinary remedy that should be used only sparingly." *Maynard v. State*, 355 Ga. App. 84, 87 (2) (842 SE2d 532) (2020) (citation and punctuation omitted).

To prove Frilando was guilty of aggravated stalking, the State had to show a pattern of harassing and intimidating behavior. *Oliver*, 325 Ga. App. at 652 (1). As set forth above, in determining whether the evidence establishes a pattern of harassing and intimidating behavior, the jury can consider "the prior history between the parties, the defendant's surreptitious conduct, as well as his overtly confrontational acts, and any attempts by the defendant to contact, communicate with, or control the victim[s] indirectly, as through third parties." *Louisyr*, 307 Ga. App. at 729 (1)

11

(citations omitted). Consequently, the trial court did not abuse its discretion by allowing the jury to consider evidence of Frilando's prior contacts with the victims.

3. Frilando contends that the trial court erred "in disallowing testimony concerning the background of the funds at the center of communication between the Appellant and his former wife." Again, we disagree.

On cross-examination, Frilando's trial counsel asked R. L. whether she had been part of the proceedings involving Frilando's guilty plea to drug conspiracy charges. The State objected on grounds of relevance. Frilando's counsel informed the trial court that his plan was to ask R. L. whether she had been a witness for the government against Frilando in the drug conspiracy case. The trial court prohibited this cross-examination of R. L. Later, before Frilando testified, the State moved to exclude evidence regarding Frilando's guilty plea in the prior drug conviction, arguing that testimony regarding R. L.'s alleged involvement in Frilando's prior drug conviction would be irrelevant to the issues being considered by the jury. The trial court granted the State's motion. The trial court expressly did not limit questions about how much money Frilando and his former wife had or where the money went, but it prohibited questions regarding how they earned the money or anything having to do with the plea itself. Frilando testified that when he went to prison, he left "a

12

couple hundred thousand" in cash and "a whole bunch of jewelry" at R. L.'s mother's house. After Frilando testified, his trial counsel proffered the following:

> The evidence that we did not bring out was that Mr. Frilando would testify that he was . . . charged and convicted and pled guilty to conspiracy to distribute crack cocaine. His wife was part and parcel of that conspiracy. She transported the dope. She transported the money. She was about an equal partner in the conspiracy.
>
> The U.S. Attorney's Office flipped her and went for the higher folks, and that's how the money came to be hidden by her after he went to prison.
>
> I think that would – yes, it's going after the witness or the alleged victim, but I think that testimony could have come out legally. And I think it would have an impact on the jury as far as, you know, who is terrorizing who. That's all I had.

Frilando argues that his entire defense was that he made contact with R. L. to get the money back they had collected together, not to harass or intimidate, and the exclusion of this testimony deprived him of a chance to explain why his contact with R. L. and K. R. was for a legitimate purpose.

OCGA § 24-4-401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "It is well-settled that questions of relevance are within the sound discretion of the trial

13

court, and absent a clear abuse of discretion, a court's decision to exclude evidence on the grounds of a lack of relevance will not be disturbed on appeal." *State v. Stephens*, 310 Ga. 57, 59 (1) (849 SE2d 459) (2020) (citation and punctuation omitted). "A trial court does not abuse its discretion by excluding irrelevant evidence." Id. (citation and punctuation omitted).

By trial counsel's own admission, the proffered relevance of the testimony was "going after the witness" and that "it would have an impact on the jury as far as . . . who is terrorizing who." As discussed in Division 1, Frilando contends that his legitimate purpose for going to the victims' house was to clarify where R. L. should send money that she felt she owed him from the sale of their house in South Carolina. As set forth above, Frilando was allowed to testify about this purportedly legitimate purpose. Moreover, Frilando testified that he had left "a couple of hundred thousand" in cash when he went to prison as well as "a whole bunch of jewelry." Thus, Frilando was not deprived of the opportunity to testify regarding what he contends was his legitimate purpose for contacting the victims. Rather, he was prohibited from providing irrelevant testimony regarding R. L.'s purported involvement in the drug conspiracy for which he went to prison. Thus, the trial court did not abuse its discretion in excluding such testimony.

14

4. Frilando contends the trial court erred in sentencing him as a recidivist under OCGA § 17-10-7 (c) because the State failed to prove the alleged prior convictions from New York. This contention has no merit.

At the sentencing hearing, to prove the prior convictions from New York, the State tendered a transcript of a plea hearing in a New York court showing that Frilando entered guilty pleas in two cases of burglary. Frilando's trial counsel stated that he had no objection. The trial court then admitted the transcript into evidence. Frilando's trial counsel conceded that Frilando had prior felony convictions and is a recidivist under OCGA § 17-10-7 (a) and (c).

Frilando now contends that the plea transcript is insufficient to show a prior conviction because it does not indicate that the New York court imposed a sentence. However, Frilando waived this argument by not objecting and conceding he was a recidivist. See *von Thomas v. State*, 293 Ga. 569, 575 (2) (748 SE2d 446) (2013) (objections to the validity of prior convictions used in aggravation of sentence can be waived); see also *Wells v. State*, 313 Ga. App. 528, 529 (1) (722 SE2d 133) (2012) ("We have held that when no objection to the form of the evidence of the prior conviction[s] was made at the pre-sentence hearing, the issue was not preserved for review on appeal."); *Thompson v. State*, 266 Ga. App. 29, 33 (3) (596 SE2d 205)

(2004) ("The time to challenge the validity of a prior conviction is at sentencing when the [S]tate attempts to prove such conviction.").

*Judgment affirmed. Gobeil and Markle, JJ., concur*.