STATE OF NORTH CAROLINA v. JOHN EVERETTE MOTLEY, III

No. COA01-1597

(Filed 5 November 2002)

**Evidence; Search and Seizure— release of rifle by one law enforcement agency to another—test results—no reasonable expectation of privacy**

The trial court did not err in an assault with a deadly weapon with intent to kill inflicting serious injury and discharging a weapon into occupied property case by determining that the release of defendant's Colt rifle by one law enforcement agency to another did not constitute an illegal search or seizure and by allowing the S.B.I. report to be admitted into evidence, because: (1) the actions by the first law enforcement agency resulted in a lawful search and seizure when defendant's consent to the search was voluntary and the rifle was also in plain view of the officers; (2) the subsequent transfer of the rifle to a detective was proper and did not constitute a separate search and seizure since defendant no longer possessed a reasonable expectation of privacy in the rifle once it was lawfully obtained by law enforcement officers; and (3) defendant never made a request or motion for the rifle to be returned to him after the previous charges were dismissed.

Appeal by defendant from judgments entered 17 May 2001 by Judge W. Erwin Spainhour in Rowan County Superior Court. Heard in the Court of Appeals 18 September 2002.

*Attorney General Roy Cooper, by Special Deputy Attorney General George W. Boylan, for the State.*

*R. Marshall Bickett, Jr., for defendant appellant.*

McCULLOUGH, Judge.

Defendant John Everette Motley, III, was tried before a jury at the 15 May 2001 Criminal Session of Rowan County Superior Court after being charged with one count of assault with a deadly weapon with intent to kill inflicting serious injury and one count of discharging a weapon into occupied property. The State's evidence at trial showed that in July 1998, Esequil Martinez was living with his brothers, their wives, one child and two friends in Salisbury, North Carolina. Around

1:30 a.m. on 29 July 1998, Martinez was sleeping in the living room, located at the front of the house, when he was awakened by a knock at the door. When Martinez answered the door, a man, later identified as defendant, stated, "I'm here to sell you a gun." After Martinez refused to buy a gun, defendant became angry and stated, "I'm not going to play around. I'm going to come back with a bigger one." According to Martinez, "[Defendant] looked bad. He looked like he was on drugs or had been drinking." Defendant left, and Martinez went back to sleep.

Approximately one hour later, Martinez woke to the sound of gunshots. Martinez testified he covered his ears, shut his eyes, and hid near the sofa until the shooting subsided. After five to ten minutes, Martinez called the Salisbury police. Several officers responded to the call within five minutes. They noted that the front of the house was full of gunshot holes, while the interior of the house had sustained great damage. Additionally, the officers discovered that Martinez's brother Victor suffered a gunshot wound to his left foot and called an ambulance for him.

Detective Tom Lowe of the Salisbury Police Department testified that he began investigating the shooting at Martinez's home on 30 July 1998. During the course of his investigation, Detective Lowe assembled photographic lineups of suspects, took them to Mr. Martinez, and asked whether any of the photographs depicted the man who tried to sell him a gun on 29 July. The first lineup did not contain a photograph of defendant, and Mr. Martinez stated that he did not recognize anyone in that set of photographs. After further investigation, Detective Lowe assembled a second photographic lineup containing defendant's photograph and showed it to Mr. Martinez in late August 1998. Mr. Martinez immediately identified defendant as the man who attempted to sell him a gun on 29 July.

Detective Lowe examined defendant's criminal history and noted that he had been arrested on 9 August 1998 in Yadkin County for carrying a concealed weapon, a knife, and for being intoxicated and disruptive. During that arrest, Deputy Richard Nixon of the Yadkin County Sheriff's Office obtained defendant's consent to search defendant's Ford truck. Deputy Nixon took several weapons into custody, including a Colt AR 15 semiautomatic rifle in plain view in the back of the truck. Deputy Nixon also confiscated 575 rounds of ammunition, which were lying next to the rifles inside defendant's truck.

Detective Lowe contacted the District Attorney's Office and was instructed to obtain the Colt rifle and the ammunition from the Yadkin County Sheriff's Office. He also went to Mr. Martinez's house and recovered two bullet fragments from the bedroom on 30 September 1998. Detective Lowe filled out custody slips on all the items, then sent them to the State Bureau of Investigation (S.B.I.) for analysis on 15 October 1998. On 22 April 1999, the SBI report was returned to Detective Lowe; it confirmed that the 39 shell casings collected from the crime scene early in the investigation were fired from defendant's Colt rifle.

Defendant testified on his own behalf and stated he had never been to Mr. Martinez's house in Salisbury and that he had never seen Mr. Martinez or any member of his family. When asked whether he shot at the testifying witnesses or into their residence, defendant stated, "No, I did not." Defendant admitted the Colt AR 15 rifle was in his truck when he was arrested by Yadkin County deputies on 9 August 1998, but stated he had the gun because he was a member of a shooting range. After elaborating on the events surrounding his arrest and other matters, defendant rested.

After deliberating, the jury found defendant guilty on both counts. The trial court sentenced defendant to consecutive terms of 116-141 months' imprisonment for his conviction of assault with a deadly weapon with intent to kill inflicting serious injury and 34-50 months' imprisonment for his conviction of discharging a weapon into occupied property. Defendant gave notice of appeal in open court.

By his sole assignment of error, defendant contends the trial court erred by determining that the release of the Colt rifle by one law enforcement agency to another did not constitute an illegal search or seizure and allowing the S.B.I. report to be admitted into evidence. After careful examination of the record and the arguments presented by the parties, we disagree and conclude defendant received a trial free from the errors assigned.

"A 'search' proscribed by the Fourth Amendment contemplates an unreasonable governmental intrusion into an area in which a person has a justifiable expectation of privacy. The fundamental inquiry in considering Fourth Amendment issues is whether a search or seizure is reasonable under all the circumstances." *State v. Francum*, 39 N.C. App. 429, 431-32, 250 S.E.2d 705, 706-07 (1979) (citations omitted). "[A] critical premise of the Fourth Amendment is that a govern-

mental search of private property or effects without prior judicial approval is *per se* unreasonable unless the search fits into a well-delineated exception to the warrant requirement and is conducted under circumstances that are, in fact, exigent." *State v. Hall*, 52 N.C. App. 492, 498, 279 S.E.2d 111, 115, *appeal dismissed, disc. review denied*, 304 N.C. 198, 285 S.E.2d 104 (1981). With these concepts in mind, we turn to the case at hand.

While defendant admits the search and seizure by Deputy Nixon on 9 August 1998 was lawful, he argues the Yadkin County Sheriff's Department lacked authority to later turn the Colt rifle over to Detective Lowe and the Salisbury Police Department because the transfer of the rifle from one law enforcement agency to another exceeded the scope of the original search. Defendant maintains that, once the investigation surrounding his Yadkin County arrest was completed, the Yadkin County law enforcement officers lost the right to retain or further examine defendant's property, since the Yadkin County arrest had nothing to do with the 29 July 1998 incident in Salisbury. Defendant also notes there was nothing illegal, *per se*, about his possession of the Colt rifle on the day he was arrested. Defendant was arrested for carrying a concealed weapon; however, that weapon was a knife, not the Colt rifle. Thus, according to defendant, there was no reason for the Yadkin County officials to hold his rifle after the 9 August 1998 incident was resolved.

Under defendant's reasoning, the Yadkin County officials also lost the authority to turn the rifle over to Detective Lowe once their investigation was over, because at that point, they were merely holding the rifle for safekeeping. Defendant contends the transfer and testing of the rifle constituted a second search and seizure which exceeded the permissible scope of the original search and seizure and violated the Fourth Amendment because the transfer was not necessary for the safeguarding of defendant's property and the S.B.I.'s ballistics examination was not reasonable under the circumstances. *See Francum*, 39 N.C. App. 429, 250 S.E.2d 705. According to defendant, the only way Detective Lowe could have lawfully obtained custody of the rifle was pursuant to a search warrant. Defendant maintains Detective Lowe's failure to procure a search warrant violated the Fourth Amendment and should have resulted in suppression of the S.B.I. report at his trial.

Upon review of the record, we agree with the State that the release of the rifle by one law enforcement agency to another did not constitute an illegal search or seizure. Immediately after Mr. Martinez

STATE v. MOTLEY

[153 N.C. App. 701 (2002)]

testified about the shooting at his home on 29 July 1998, the State called Deputy Nixon to provide *voir dire* testimony regarding defendant's arrest on 9 August 1998 in Yadkin County. Deputy Nixon stated that he responded to a call concerning a man (later identified as defendant) who was threatening another man with an assault rifle in a church parking lot. Once at the scene, Deputy Nixon and another officer saw defendant standing near a Ford truck. As they approached, they handcuffed defendant for their safety while they assessed the situation. The other man, Mr. Roger Sizemore, stated that defendant pointed an assault rifle at him and threatened to kill him. After speaking to Mr. Sizemore and another witness, Deputy Nixon arrested defendant for being intoxicated and disruptive. While performing a pat-down search of defendant's person, Deputy Nixon discovered a sharp dagger in defendant's belt and also arrested defendant for carrying a concealed weapon. Because defendant was standing within a few feet of the Ford truck, Deputy Nixon asked defendant's permission to search it. Deputy Nixon testified as follows:

Q. [Prosecutor] And, how was it you came to search the Ford truck that the defendant was near?

A. [Deputy Nixon] The defendant gave us consent to search his vehicle.

Q. You specifically asked him for consent?

A. Yes, ma'am.

Q. And, what, if anything unusual, did you find in the Ford truck?

A. When we approached the defendant and put him into—to take him into custody, the bed of the truck had a camper shell on it, the tailgate was down and the camper shell lid was open and immediately when we approached, we noticed where the rifle was laying in the bed of the truck near the tailgate area.

Q. The tailgate was up or down?

A. It was down.

Q. All right, and were these weapons to the best of your recollection touching the tailgate area, or were they up into the bed of the truck?

A. No, ma'am. They were right at the tailgate.

Q. Okay, towards the edge of the bed?

A. Yes, ma'am.

Q. And, what kind of weapons did you see at that point?

A. One was an AR 15[.]

After considering Deputy Nixon's *voir dire* testimony, the trial court concluded the warrantless search of defendant's truck was proper under *State v. Isleib*, 319 N.C. 634, 356 S.E.2d 573 (1987). The trial court further concluded the rifle was properly seized after defendant consented to the search of his truck. Defendant then argued that a separate search and seizure occurred when Detective Lowe obtained the rifle, and that those actions violated the Fourth Amendment because they were done without a warrant and in connection with the investigation of an entirely separate crime. After listening to defendant's argument, the trial court stated:

THE COURT: Well, wouldn't it be a bit more reasonable to say that once [the rifle is] out of the possession of the defendant having been seized pursuant to a lawful arrest, incident to arrest, and in plain view by one law enforcement agency, that that's the only search and seizure that takes place? Wouldn't that be reasonable? I mean, you're saying that anytime another law enforcement agency gets control over the instrumentality of the latest crime, that a separate search is occurring. Therefore, a search warrant ought to be issued on each such occasion. Is that what your point is?

According to the trial court, even though the Yadkin County charges were dismissed on 25 November 1998 and there was no ongoing investigation of that incident as of the date Detective Lowe obtained custody of the rifle, Detective Lowe's seizure was reasonable.

We agree with the trial court that (1) the actions by the Yadkin County officials on 9 August 1998 resulted in a lawful search and seizure, and (2) the subsequent transfer of the rifle to Detective Lowe was proper and did not constitute a separate search and seizure. Defendant was arrested after Deputy Nixon and his fellow officer spoke to two witnesses and determined that defendant had acted unlawfully. Defendant's rifle was seized only after Deputy Nixon procured defendant's consent.

Consent searches have long been recognized as a "special situation excepted from the warrant requirement, and a search is

STATE v. MOTLEY

[153 N.C. App. 701 (2002)]

not unreasonable within the meaning of the Fourth Amendment when lawful consent to the search is given." *State v. Smith*, 346 N.C.[] 794, 799, 488 S.E.2d 210, 214 (1997). "Consent to search, freely and intelligently given, renders competent the evidence thus obtained." *State v. Frank*, 284 N.C. 137, 143, 200 S.E.2d 169, 174 (1973) (citations omitted). "[T]he question whether consent to a search was in fact 'voluntary' or was the product of duress or coercion, expressed or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 36 L. Ed. 2d 854, 862-63 (1973).

*State v. Graham*, 149 N.C. App. 215, 218-19, 562 S.E.2d 286, 288 (2002). Defendant's consent was voluntary and obviated the need for a warrant. The evidence also indicates that the rifle was in plain view of the officers, providing yet another proper basis for the search and seizure by Deputy Nixon.

The trial court concluded, and we agree, that extension of defendant's logic would not make sense. According to defendant, anytime a second law enforcement agency takes custody of an instrumentality of crime from the seizing agency, a separate search occurs, thus requiring that a search warrant be issued on each such occasion. The United States Supreme Court has said "it is difficult to perceive what is unreasonable about the police examining and holding as evidence those personal effects of the accused that they already have in their lawful custody as the result of a lawful arrest." *United States v. Edwards*, 415 U.S. 800, 806, 39 L. Ed. 2d 771, 777 (1974). Here, defendant conceded that the search and seizure by Yadkin County officials on 9 August 1998 was lawful.

Moreover, the transfer of defendant's rifle from one law enforcement agency to another did not constitute a search or seizure subject to constitutional scrutiny because defendant no longer possessed a reasonable expectation of privacy in the rifle once it was lawfully obtained by law enforcement officials in Yadkin County. *See State v. Steen*, 352 N.C. 227, 241, 536 S.E.2d 1, 9-10 (2000), *cert. denied*, 531 U.S. 1167, 148 L. Ed. 2d 997 (2001). Defendant never made a request or motion for the Colt rifle to be returned to him, after the previous charges were dismissed.

Our Court has previously held that once evidence is validly obtained, the owner no longer has a possessory or ownership interest in it, and any legal expectation of privacy has disappeared. *State v. Barkley*, 144 N.C. App. 514, 551 S.E.2d 131, *appeal dismissed*, 354

N.C. 221, 554 S.E.2d 646 (2001). In *Barkley*, the defendant's blood had been drawn as part of a murder investigation which was wholly separate from his trial for first-degree rape and first-degree kidnapping. *Id.* at 516-17, 551 S.E.2d at 133-34. When defendant learned the blood evidence would be introduced at trial, he moved to suppress it. *Id.* The *Barkley* Court rejected defendant's argument that a blood sample obtained in relation to one uncharged crime could not be used as evidence against him in another unrelated crime without violating his Fourth Amendment rights. *Id.* at 518, 551 S.E.2d at 134. The *Barkley* Court concluded the blood sample could be used to investigate both the crimes for which defendant was being tried and the unrelated murder without violating the Fourth Amendment, because in those circumstances, "a reasonable person would have understood by the exchange [between himself and law enforcement officers] that his blood analysis could be used generally for investigative purposes, not exclusively for the murder investigation." *Id.* at 521, 551 S.E.2d at 136. In reaching its conclusion, the *Barkley* Court quoted *People v. King*, 663 N.Y.S.2d 610, 232 A.D.2d 111, which stated:

> "It is also clear that once a person's blood sample has been obtained lawfully, he can no longer assert either privacy claims or unreasonable search and seizure arguments with respect to the use of that sample. Privacy concerns are no longer relevant once the sample has already lawfully been removed from the body, and the scientific analysis of a sample does not involve any further search and seizure of a defendant's person. In this regard we note that the defendant could not plausibly assert any expectation of privacy with respect to the scientific analysis of a lawfully seized item of tangible property, such as a gun or a controlled substance. Although human blood, with its unique genetic properties, may initially be quantitatively different from such evidence, once constitutional concerns have been satisfied, a blood sample is not unlike other tangible property which can be subject to a battery of scientific tests."

*Barkley*, 144 N.C. App. at 519, 551 S.E.2d at 134-35 (quoting *People v. King*, 663 N.Y.S.2d at 614-15, 232 A.D.2d at 117-18).

Though *Barkley* dealt with a blood sample obtained from the defendant, we believe the logic of *Barkley* reasonably extends to encompass other types of evidence, including data obtained from ballistics testing of defendant's rifle. Upon review of the present case, we believe the trial court properly admitted the S.B.I. test results at defendant's trial after concluding that the release of the Colt rifle by

ERIE INS. EXCH. v. ST. STEPHEN'S EPISCOPAL CHURCH

[153 N.C. App. 709 (2002)]

one law enforcement agency to another did not constitute an illegal search and seizure. We hold that the transfer of properly seized tangible items from one law enforcement agency to another for scientific testing or further analysis does not constitute an impermissible seizure, as defendant lacks a reasonable expectation of privacy in the object. Consequently, a defendant cannot object when the item lawfully seized is subsequently introduced at trial. After thoughtful consideration of the record and the arguments of the parties, we conclude defendant received a fair trial free from error.

No error. .

Judges TYSON and BRYANT concur.