**FIRST DIVISION**
**BARNES, P. J.,**
**BROWN and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 29, 2022**

# In the Court of Appeals of Georgia

A22A0254. OLIVER v. THE STATE.

BROWN, Judge.

Anthony Oliver, pro se, appeals from his convictions of aggravated stalking, attempt to commit a felony (aggravated stalking), and making a false statement. Oliver's brief outlines 26 different alleged errors, some of which are duplicative and will be considered together. In general, he asserts that insufficient evidence supports his convictions and raises issues concerning the admission of evidence, a request for a change of venue, ineffective assistance of trial counsel, and sentencing errors. Based on the State's failure to present sufficient evidence of venue for aggravated stalking, we reverse that conviction. We find no merit in Oliver's remaining

contentions on appeal and affirm his attempt and making a false statement convictions.[1]

On appeal from a criminal conviction, the standard for reviewing the sufficiency of the evidence

> is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. This Court does not reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence.

(Citations and punctuation omitted.) *Hayes v. State*, 292 Ga. 506 (739 SE2d 313) (2013). As outlined below, the State introduced evidence showing Oliver's long history of harassing and stalking the mother of his two children, who were born in 2004 and 2005, for over 15 years in multiple states. The events which resulted in Oliver's convictions took place on February 24, 2019, and early April 2019.

*Oliver's Past History with the Mother*

---

[1] We have circulated this decision among all nondisqualified judges of the Court to consider whether this case should be passed upon by all members of the Court. Fewer than the required number of judges, however, voted in favor of a hearing en banc on the question of disapproving *Fincher v. State*, 363 Ga. App. 439, 450-452 (6) (870 SE2d 833) (2022).

The mother testified that she met Oliver in California and their relationship was good until she became pregnant with their daughter in 2004. He then became physically abusive (pulling her hair and hitting and punching her) and mentally abusive (degrading her, putting her down, and name calling). She attempted to leave Oliver on more than one occasion and repeatedly tried to escape him, including by moving to other states. She obtained her first protective order in California because he was "coming [to her] workplace, calling nonstop, emailing, [and] getting in contact with family members." The mother acknowledged that she reconciled with Oliver after obtaining the protective order because "he wouldn't leave me alone and, to me, it was just easier to go back. . . ."

The mother eventually "had enough and left him again." Two months after she moved to Tennessee from California, he appeared pounding at her door. When she moved to Minnesota, he also came to her home, hit and choked her, and pulled her hair. In 2007 and 2008, at a time when Oliver did not know the mother's location, he sent her numerous e-mails indicating that he would find her, asking her to give gifts to the children, and threatening to make it hard for people with whom she was living so that they would ask her to leave.

In 2008, the mother moved to Effingham County, Georgia and did not see Oliver for many years. In February 2016, she received an e-mail from Oliver in which he indicated that he knew her Georgia address and threatened to come to Georgia once someone could take pictures and confirm her location. The mother contacted police and told them that Oliver "told her he would do anything to see his children, even kill her." After a man came to the mother's door, took pictures, and asked questions, Oliver sent her an e-mail in March 2016, stating that he was leaving Arizona and coming to see his children.

Three months later, the mother was checking out at a Walmart when Oliver walked up to his daughter as she pulled a drink out of a cooler. The mother testified that she was "in shock" and that her daughter "had this look on her face like she was shocked, too." When the mother and her daughter walked outside, Oliver followed them to the car. He took a picture of himself with his daughter and told the mother that she would "be sorry" if she did not allow him to see the kids. It is unclear from the mother's testimony whether the daughter heard this threat. After the encounter at the Walmart, Oliver began calling the mother, her boyfriend, and other family members from blocked numbers. He "was coming around all the time. . . . [H]e would just show up and be there."

The mother admitted that at one point after Oliver came to Georgia, she allowed him to see the children because "[she] was scared not to" and hoped that "things would calm down and be okay, and I wouldn't have to deal with all this other stuff that comes from me not letting him." She also testified that the children wanted to see him and she felt guilty because they did not know him.

The mother testified that after allowing Oliver to see the children, "things start[ed] to kind of get bad again." Oliver had "no boundaries. He was just showing up whenever he wanted. If he couldn't get the kids, he would just try to cause a bunch of trouble. He was doing things in front of the kids or talking about things that he shouldn't in front of the kids. He wasn't being a very good parent." An exhibit introduced into evidence by the State indicated that "the children expressed to [the mother] that they were not comfortable . . . visiting . . . with Oliver anymore due to his drinking and saying bad things about [the mother]." In September 2016, Oliver told the mother "you're dead" when she refused to allow him to see the children. On October 4, 2016, Oliver filed a petition for legitimation of the children.

On June 15, 2017, the mother called the police because she believed that Oliver had slashed the tires on her car. On June 29, 2017, Oliver made an allegation of child abuse, resulting in a police officer coming to the mother's home. The police officer

who responded to the call determined that Oliver's allegation of injury to the child was unfounded, but nonetheless notified DFCS as he was required to do based on the nature of the allegation. At the time of his investigation, the mother complained that Oliver had been talking to their son through a back fence and asked the officer to issue a criminal trespass warrant banning him from the mother's address. The officer complied with her request.

In July 2017, Oliver appeared at a Walmart once again while the mother was shopping with her daughter and approached them. When the mother asked how he knew she was there, he laughed and said "stalker status." The mother called the police.

On August 14, 2017, the court presiding over the legitimation action entered a consent restraining order precluding Oliver from approaching within 200 yards of the mother, as well as all direct or indirect communication with her. On August 29, 2017, the court denied Oliver's petition to legitimate.

In September 2017, Oliver threw a plastic bag containing a prepaid phone and charger at their son when he was playing outside at a friend's house and told the son to call him. On September 26, 2017, Oliver filed a lawsuit against the mother and her boyfriend asserting that they had breached a contract to purchase dogs to breed as a

money-making venture. He sought punitive damages in the amount of $2 million. The trial court dismissed this action on March 21, 2018.

On October 2, 2017, the mother saw Oliver following her in his car while she was driving the children home from school and notified the police. On October 13, 2017, Oliver called the police to assist him in collecting a cell phone from the mother. The mother testified that she had already returned the phone to Oliver before he called the police. The police officer testified that he spoke with the mother in response to Oliver's complaint and she was "visibly shaken[,] crying[, and] very obviously scared." The officer was aware that Oliver was barred from being around the mother and concluded that Oliver "was just using law enforcement to harass her." On October 19, 2017, the mother sought a protective order based upon her fear of Oliver and his continued harassment. On October 24, 2017, the Effingham County Superior Court issued an ex parte temporary protective order.

On November 2, 2017, Oliver called the police and asked them to do a welfare check on the children. The same officer who responded to Oliver's October 13, 2017 request for assistance to retrieve his cell phone, spoke with the mother and described her as "in worse shape this time. She was to the point of panic." He contacted the children's school and verified that they "were fine."

On December 18, 2017, Oliver filed a complaint against the mother, Governor Nathan Deal, the Superior Court of Effingham County, the mother's attorney in the breach of contract case, an advocate who helped the mother with a restraining order, six judges in various Effingham County courts, and Effingham County's sheriff. He asserted claims for intentional infliction of emotional distress, violations of 42 USC § 1983, and injunctive relief. He sought over $17 million in damages. On March 21, 2018, Oliver dismissed this case with the stated intention to refile in federal court, and the State introduced evidence showing that he later filed a federal court action. After that court imposed conditions upon Oliver's continued use of its resources, Oliver voluntarily dismissed the action. In addition to the lawsuits filed against the mother, the State introduced other act evidence of suits filed by Oliver against third parties in California and a federal court order declaring him to be a vexatious litigant subject to pre-filing procedures.

On September 20, 2018, the Superior Court of Chatham County issued a permanent family violence protective order prohibiting Oliver from having "any contact, direct, indirect or through another person with [the mother]" and restraining Oliver "from doing or attempting to do, or threatening to do, any act of injury, maltreating, molesting, harassing, harming, or abusing the Petitioner's family or

household[.]" The order does not identify the children by name. It included a notice to Oliver that a violation of the order "may result in immediate arrest and criminal prosecution. . . ."

*Events Resulting in Oliver's Convictions on Appeal*

On February 24, 2019, the mother, a boyfriend, and her children were driving to a wildlife refuge in South Carolina. As she was driving, she started receiving texts and calls from her daughter's best friend. One of the text messages stated, "I need to talk to you." The mother testified that she "couldn't answer" and returned the call when she pulled into the parking lot of the wildlife refuge.

At that time, her daughter's friend "said that herself, her mother, and her mother's best friend were at [a restaurant] eating and . . . [Oliver] was [seated] behind her. And [the mother's friend] kept seeing this man staring [and] she didn't know who he was." The daughter's friend turned around, realized it was Oliver, and explained who he was to her mother. Oliver continued staring at them as they continued to eat. They hurried to finish eating and when they left, Oliver approached the daughter's friend and asked where his child was. After the friend stated, "With her mom," Oliver said, "Well, tell her that I have over $6,000 worth of Christmas presents sitting in my apartment that I don't know what to do with."

The mother testified that this message made her "scared," and she viewed it as Oliver "letting us know that he's around," particularly if he had followed the friends to the restaurant. Her fear was not caused by the content of the message regarding the presents, but rather "the fact he was wanting that message, whatever message it was, to be sent knowing that he don't care. He's going to do what he wants to do just — obviously, to let us know that he's around." She testified that she is "always in fear, because I don't know what he is capable of doing."

The friend who conveyed the message to the mother testified that she had met Oliver only once in 2017, and that she was "creeped out" by Oliver's conduct in staring at her in the restaurant in February 2019. The friend's mother testified that she "told [her daughter] to tell [the mother] not [her daughter's friend]." The friend stated that she was located in Chatham County when she texted and attempted to call the mother. The restaurant in which Oliver conveyed the message also is located in Chatham County.

On April 2, 2019, Oliver was arrested for aggravated stalking. The officer advised him that the probable cause listed in the warrant was that he violated a protective order at 220 Pooler Parkway on February 27. At Oliver's request, the officer looked up the address and advised him that it was a Logan's Steakhouse. A

police officer testified that while sitting in the back of a patrol car, Oliver "said that he had never been to that place in his entire life, referring to the 220 Pooler Parkway that he requested us to look up" and that "I've never been to the Logan's Steakhouse." The State introduced a receipt showing that Oliver made a purchase at Logan's Roadhouse located at 220 Pooler Parkway on February 24, 2019, at 1:15 p.m.

The State charged Oliver with aggravated stalking of the mother and attempted aggravated stalking of the daughter based on his conduct on February 24, 2019, "in violation of a permanent protective order" and making a false statement to a police officer when he denied having been to the restaurant. The State also gave notice of its intent to seek recidivist sentencing. Following a trial, a jury found Oliver guilty of all three counts after deliberating for 35 minutes. The trial court sentenced Oliver to serve a total of 20 years as a recidivist under OCGA § 17-10-7 (a). It also barred him from the First, Second, Eighth, and Tenth Judicial Districts of Georgia, which the trial court characterized as "effectively south Georgia." Finally, it imposed a special condition of probation requiring Oliver to file a "Request to File" in the Clerk of Court's Office in the jurisdiction in which he intends to file, along with the document he seeks to file and a copy of the special condition order. The trial court noted in its

sentencing order that it was "not enjoin[ing] Oliver from future filings, but instead mandat[ing] as a condition on his sentence that Oliver observe certain conditions before filing."

1. *Sufficiency of the Evidence*. In related enumerations of error, Oliver contends that insufficient evidence supports his convictions.

(a) *Aggravated Stalking of the Mother*. Oliver asserts that the State failed to adequately prove aggravated stalking because the State failed to prove multiple violations of the permanent protective order, a pattern of harassing and intimidating behavior, contact with the mother, and venue. In Georgia,

> [a] person commits the offense of aggravated stalking when such person, in violation of a . . . permanent protective order, . . . follows, places under surveillance, or contacts another person at or about a place or places without the consent of the other person for the purpose of harassing and intimidating the other person.

OCGA § 16-5-91 (a). See also *State v. Burke*, 287 Ga. 377, 378 (695 SE2d 649) (2010).

(i) *Pattern and Alleged Requirement for Multiple Violations of a Protective Order*. "The definition [of 'harassing and intimidating'] contained in the simple stalking statute [applies to aggravated stalking] because the legislature has made clear

12

that the simple stalking statute defines [the phrase] for purposes of the entire article on stalking in the Georgia Code." (Citation and punctuation omitted.) *Burke*, 287 Ga. at 378. The phrase "harassing and intimidating" therefore means

> a knowing and willful course of conduct directed at a specific person which causes emotional distress by placing such person in reasonable fear for such person's safety or the safety of a member of his or her immediate family, by establishing a pattern of harassing and intimidating behavior, and which serves no legitimate purpose. This Code section shall not be construed to require an overt threat of death or bodily injury has been made.

OCGA § 16-5-90 (a) (1). Because a *pattern* of harassing and intimidating behavior is required, "[a] single violation of a protective order, alone, simply does not establish [the requisite] pattern [Cit.]" *Burke*, 287 Ga. at 379. But, "one act of violating a protective order, when done as part of a pattern of harassing and intimidating behavior, can constitute the crime of aggravated stalking." (Citation omitted.) *State v. Cusack*, 296 Ga. 534, 537-538 (769 SE2d 370) (2015). For example, in *Louisyr v. State*, 307 Ga. App. 724 (706 SE2d 114) (2011), we explained that multiple violations of a protective order are not required if the single violation of a protective order is part of a pattern of harassing and intimidating behavior. Id. at 729 (1).

13

In determining whether a defendant has exhibited such a pattern of behavior, the jury can consider a number of factors, including the prior history between the parties, the defendant's surreptitious conduct, as well as his overtly confrontational acts, and any attempts by the defendant to contact, communicate with, or control the victim indirectly, as through third parties.

(Citations omitted.) Id.

In this case, the State presented ample evidence of Oliver's harassing and intimidating behavior for over a decade, as well as evidence that the mother was in reasonable fear for her safety based upon Oliver's past conduct in actually causing physical harm to the mother and threatening her with physical harm after he located her in Georgia. Accordingly, the State presented sufficient evidence of a pattern of harassing and intimidating behavior, and it was not necessary for it to prove multiple violations of the permanent protective order. See *Louisyr*, 307 Ga. App. at 729 (1).

(ii) *Contact*. Oliver's contention that the State failed to prove contact has no merit. OCGA § 16-5-90 (a) (1) defines "contact" to include "any communication," and this Court has concluded that "[t]his definition is broad enough to include intentionally sending a message to another person by telling a third party who would be reasonably expected to convey the message to the victim." *Harvill v. State*, 296

Ga. App. 453, 456 (1) (a) (674 SE2d 659) (2009). Oliver argues that the intended recipient of his message was his daughter, not the mother, and that the friend and the friend's mother took it upon themselves to give the message to the mother rather than the daughter. "The intention with which an act is done is peculiarly for the jury, and the jury below obviously found that [Oliver] had the requisite intent [to contact the mother]." (Citation and punctuation omitted.) *Hollis v. State*, 295 Ga. App. 529, 534 (4) (a) (672 SE2d 487) (2009). As the evidence would allow a rational trier of fact to reach that conclusion, we find no merit in Oliver's claim that the State failed to sufficiently prove contact.

(iii) *Venue*. Oliver asserts that the State failed to prove venue in Chatham County for his aggravated stalking conviction because the mother was located in South Carolina when she talked on the telephone with her daughter's friend about what he had said at the restaurant. We agree.

"Georgia['s] Constitution requires that venue in all criminal cases must be laid in the county in which the crime was allegedly committed." *Bowen v. State*, 304 Ga. App. 819, 822-823 (1) (b) (697 SE2d 898) (2010). "OCGA § 17-2-2 (a) gives effect to this constitutional mandate by providing that '[c]riminal actions shall be tried in the county where the crime was committed, except as otherwise provided by law.'"

15

*State v. Kell*, 276 Ga. 423, 425 (577 SE2d 551) (2003). Although the aggravated stalking statute, OCGA § 16-5-91, does not contain a specific venue provision, OCGA § 16-5-90, which defines stalking, contains the following provision relevant to our analysis of venue in this case:

> For the purpose of *this article*, . . . the term "contact" shall mean any communication including without being limited to communication in person, by telephone, . . . or by any other electronic device . . . and the place or places that contact by telephone, mail, broadcast, computer, computer network, or any other electronic device is deemed to occur shall be the place or places where such communication is received.

(Emphasis supplied.) OCGA § 16-5-90 (a) (1). As Georgia's stalking offenses are contained in Article 7, Chapter 5 of Title 16 in the Georgia Code, and the State charged Oliver with committing aggravated stalking by "unlawfully contacting [the mother,]" we must determine whether the language in OCGA § 16-5-90 (a) (1) governs venue based on the facts presently before us. Cf. *Burke*, 287 Ga. at 378 (holding that legislature made it clear that definitions in simple stalking statute apply to entire article on stalking).

An examination of the text of OCGA § 16-5-90 (a) (1) shows that the communication "is deemed to occur" in the place where the communication is

16

received only when the contact is made "by telephone, mail, broadcast, computer, computer network, or any other electronic device. . . ." This Court previously has recognized that this language governs venue in aggravated stalking cases committed through communication by telephone, *Anderson v. Deas*, 279 Ga. App. 892, 893 (632 SE2d 682) (2006) ("When a person commits the offense of stalking by placing a harassing or intimidating telephone call to another person, the offense is deemed to occur at the place where the communication is received."), and we agree with that conclusion.[2] In this case, Oliver's communication was made in person to a third party, who in turn communicated the message to the mother by telephone. Thus, we must decide whether venue is determined by Oliver's communication to the third party in person in Chatham County or the third party's communication of Oliver's message to the mother by telephone when she was located in South Carolina.

Our Supreme Court has explained that "[s]tudying the key verbs which define the criminal offense in the statute is helpful in determining venue in doubtful cases." (Citation and punctuation omitted.) *Kell*, 276 Ga. at 425.

---

[2] To the extent our opinion in *Fincher v. State*, 363 Ga. App. 439, 450-452 (6) (870 SE2d 833) (2022), stands for the proposition that venue for aggravated stalking can lie in the county in which the telephone call was initiated, it is disapproved.

17

> While the "verb test" certainly has value as an interpretative tool, it cannot be applied rigidly, to the exclusion of other relevant statutory language[,] . . . [which] must be considered in determining the scope of the prohibition imposed by [the criminal statute] and, consequently, the location of permissible venues for a prosecution under that statute.

(Citation and punctuation omitted.) *State v. Mayze*, 280 Ga. 5, 6-7 (622 SE2d 836) (2005). The key verb in OCGA § 16-5-91 (a) relevant to this case is "contacts," which is further defined in OCGA § 16-5-90 (a) (1) as "any communication." And this communication must be with "another person . . . without the consent of the other person for the purpose of harassing and intimidating the other person." OCGA § 16-5-90 (a) (1). Since the "person" alleged in the indictment was the mother, the crime was not complete until she received Oliver's message by telephone in South Carolina from the third party. See *Seibert v. State*, 321 Ga. App. 243, 245 (739 SE2d 91) (2013) (evidence insufficient to support aggravated stalking conviction where intended victim never received letter given to third party by defendant). As the evidence showed that the mother learned about and received Oliver's communication by telephone while she was in South Carolina, the State presented insufficient evidence of venue in Chatham County, and we must therefore reverse his conviction. In so holding, we note that when "a criminal conviction is reversed because of an

18

evidentiary insufficiency concerning the procedural propriety of laying venue within a particular forum, and not because of an evidentiary insufficiency concerning the accused's guilt, retrial is not barred by the Double Jeopardy Clause." (Citation and punctuation omitted.) *Lee v. State*, 305 Ga. App. 214, 216 (2) (d) (699 SE2d 389) (2010).

(b) *Attempted Aggravated Stalking of the Daughter*. Oliver contends that insufficient evidence supports his attempted aggravated stalking conviction because the mother "actually relayed" his message to their daughter and it therefore should not be considered "an attempt" crime. He also points out that the indictment listed the mother's last name for his daughter rather than his own, which he alleges to be her legal last name. In his view, he cannot be guilty of attempting to stalk a person that does not exist. Finally, he asserts that the State was required to prove all of the elements of aggravated stalking to prove attempt and that a single violation of a protective order could not support his attempt conviction. We find no merit in these arguments.[3]

---

[3] While Oliver also asserted generally that "[t]he venue and jurisdiction of this case was in South Carolina, not in Chatham County, Georgia," his argument and citation of authorities go solely to his aggravated stalking conviction. He therefore has abandoned any such claim with regard to his attempt and false statement convictions. See Court of Appeals Rule 25 (a) (3), (c) (2)." *Gayton v. State*, 361 Ga.

19

(i) *Delivery of the Message*. The mother's subsequent conduct in relaying the content of Oliver's message to their daughter has no effect on the sufficiency of Oliver's attempted aggravated stalking of his daughter. See *Scott v. State*, 309 Ga. 764, 767 (2) (848 SE2d 448) (2020) ("[A] person may be convicted of the offense of criminal attempt if the crime attempted was actually committed in pursuance of the attempt. . . .") (citation and punctuation omitted).

(ii) *Misnomer*. We find no merit in Oliver's contention that the misnomer in the indictment renders the evidence against him insufficient. A "misnomer of the victim in the indictment is not a fatal error. A variance between the victim's name as alleged in the indictment and as proven at trial is not fatal if the two names in fact refer to the same individual. . . ." (Citation and punctuation omitted.) *Parks v. State*, 246 Ga. App. 888, 889 (1) (543 SE2d 39) (2000).

(iii) *Elements of Underlying Crime*. Oliver's contention that the State had to prove all of the elements of aggravated stalking to establish attempted aggravated stalking is incorrect. "Criminal attempt is accomplished 'when, with intent to commit a specific crime, a person performs any act which constitutes a substantial step toward

App. 809, 818-819 (2) (865 SE2d 628) (2021). See also *Jackson v. State*, 309 Ga. App. 796, 801 (5) (714 SE2d 584) (2011).

20

the commission of that crime.' OCGA § 16-4-1." (Punctuation omitted.) *McIntyre v. State*, 312 Ga. 531, 534 (1) (863 SE2d 166) (2021). Requiring the State to prove all of the elements of an underlying crime "would eviscerate the purpose of delineating attempt as an offense." *Davis v. State*, 281 Ga. App. 855, 859 (2), n.11 (637 SE2d 431) (2006). Accordingly, Oliver's argument that insufficient evidence supports his attempt conviction because the State allegedly proved only a single violation of a protective order has no merit.

(c) *Making a False Statement.* In a bolded heading, Oliver contends that the State "failed to prove all essential elements of . . . [m]aking a false statement," but offers no argument or citation of authority in support of this contention. "Because [Oliver] failed to support this enumeration with argument, the enumeration is deemed abandoned. See Court of Appeals Rule 25 (a) (3), (c) (2)." *Gayton v. State*, 361 Ga. App. 809, 818-819 (2) (865 SE2d 628) (2021). See also *Jackson v. State*, 309 Ga. App. 796, 800-801 (5) (714 SE2d 584) (2011).

2. *Admission of Other Act Evidence.* Oliver contends that the trial court erred by allowing evidence of lawsuits filed by him in which the mother was not named as a defendant. Following a hearing, the trial court admitted this evidence based on its conclusion that the lawsuits "document a pattern of frivolous and vexatious litigation

21

ostensibly directed at harassing and intimidating the other litigants" and are "highly probative (Rule 403) on the question of intent." Even if we assume, without deciding, that this evidence should not have been admitted, we conclude "that the State introduced strong independent evidence of [Oliver]'s guilt such that any error in admitting . . . the other act[ ] evidence was harmless." *Fincher v. State*, 363 Ga. App. 429, 446 (2) (870 SE2d 833) (2022).

> The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict. In doing so, we weigh the evidence as we would expect reasonable jurors to have done so, as opposed to assuming that they took the most pro-guilt possible view of every bit of evidence in the case.

(Citation and punctuation omitted.) Id. at 445 (2). In this case, "we have no difficulty concluding that it is highly probable that any error . . . did not contribute to the jury's guilty verdict in this trial." (Citation, punctuation and footnote omitted.) *Boothe v. State*, 293 Ga. 285, 289-290 (2) (b) (745 SE2d 594) (2013).

3. *Change of Venue*. We find no merit in Oliver's contention that the trial court erred by failing to rule on his motion to change venue. As the trial court pointed out in the motion for new trial hearing, it held a hearing before Oliver's trial and denied the motion. At the end of his argument regarding the trial court's alleged failure to

22

rule on his motion to change venue, Oliver cryptically states: "The trial court also denied the Appellant an opportunity to conduct a voir dire." To the extent that Oliver is asserting a separate claim of error in this sentence, we find that he has failed to support it with citation to the record and argument. See Court of Appeals Rule 25 (a) (3), (c) (2).

4. *Ineffective Assistance of Counsel*. Oliver contends that he received ineffective assistance of counsel in numerous ways, which we will address in more detail below.[4]

> To prevail on a claim of ineffective assistance of counsel, [Oliver] must show that trial counsel's performance was so deficient that it fell below an objective standard of reasonableness, and that counsel's deficient performance prejudiced the defense such that a reasonable probability exists that the trial results would have been different but for counsel's performance. *Strickland v. Washington*, 466 U. S. 668 (II) (104 SCt 2052, 80 LE2d 674) (1984).

*Bragg v. State*, 295 Ga. 676, 678 (4) (763 SE2d 476) (2014). "Trial tactics and strategy, no matter how mistaken in hindsight, are almost never adequate grounds for

---

[4] We note that while Oliver filed a pro se amended motion for new trial raising various grounds of ineffective assistance of counsel for the first time while he was still represented by counsel, he later re-alleged these arguments after the trial court approved counsel's withdrawal and allowed Oliver to represent himself.

finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them." (Citation and punctuation omitted.) *Brown v. State*, 321 Ga. App. 765, 767 (1) (743 SE2d 452) (2013).

(a) *Directed Verdict*. Oliver argues he received ineffective assistance of counsel based upon trial counsel's alleged failure to seek a directed verdict or "argue" the sufficiency grounds Oliver raises on appeal with regard to aggravated stalking and attempt. As the trial court correctly found in its order, trial counsel moved for a directed verdict at the close of the State's case. Moreover, based on our holdings in Division 1, Oliver's arguments "'present[ ] an insufficient ground as a matter of law for claiming ineffective assistance of counsel,' [Cit.]" *Jones v. State*, 278 Ga. 880 (608 SE2d 229) (2005), or are moot. *Johnson v. State*, 214 Ga. App. 77, 81 (2) (447 SE2d 74) (1994).

(b) *General Trial Performance and Preparation*. Oliver maintains that his trial counsel failed "to properly cross[-]examine all witnesses" with matters Oliver believes should have been raised, as well as having no "opening or closing argument whatsoever[,]" and no "defense theory whatsoever[.]"

After reviewing Oliver's briefs, the trial transcript and exhibits, counsel's testimony in the motion for new trial hearing, the trial court's order, the record, and

24

relevant law, we find that Oliver has failed to satisfy his burden of establishing ineffective assistance of counsel on these grounds. "[D]ecisions about what questions to ask on cross-examination are quintessential trial strategy and will rarely constitute ineffective assistance of counsel." (Citation and punctuation omitted.) *Edwards v. State*, 299 Ga. 20, 24 (2) (785 SE2d 869) (2016). With regard to counsel's alleged deficiencies in his opening, closing, and defense theories, "[Oliver] has not overcome the strong presumption that trial counsel's performance was reasonable and that counsel's decisions and choices at trial fell within the broad range of professional conduct as assessed from counsel's perspective at the time of trial and under the specific circumstances of the case." (Citation and punctuation omitted.) *Harris v. State*, 345 Ga. App. 80, 81-82 (1) (a), (b) (812 SE2d 342) (2018) (rejecting ineffective assistance of counsel claim premised upon counsel's "short" opening and closing argument that did not explain basic principles of law). Finally, the trial court properly concluded in its order denying Oliver's motion for new trial, "trial counsel presented a sensible defense theory."

(c) *Failure to Make Motions*. Oliver contends that counsel was ineffective for failing to renew his motion for a change of venue, as well as failing to make a motion

25

in limine, for mistrial, and to suppress a search warrant. We find no merit in these contentions.

(i) *Change of Venue*. Oliver claims that trial counsel "was ineffective for failing to renew the very Motion he filed to begin with[,]" but makes no argument as to when counsel should have renewed the motion, and it is difficult for this Court to discern from his brief what additional grounds Oliver contends that counsel should have raised.

> To prevail on a motion for change of venue . . . , a defendant must show either that the setting of the trial was inherently prejudicial or that the jury selection process showed actual prejudice to a degree that rendered a fair trial impossible. The record contains no evidence which would support a change of venue on either of the above grounds, and appellant can but speculate, based on contents of the record, that the trial court would have granted a change of venue had the motion been renewed. The filing of frivolous motions is not condoned, let alone required of competent counsel. It is not deficient to fail to file a frivolous motion.

(Citation and punctuation omitted.) *White v. State*, 221 Ga. App. 860, 864 (3) (473 SE2d 539) (1996). Accordingly, we find no merit in this ground of ineffective assistance.

26

(ii) *Military Evidence and Testimony*. Oliver contends that trial counsel should have moved in limine to prevent the State from presenting the testimony of a United States Secret Service agent about photographs found in a forensic examination of Oliver's electronic devices, which had been seized pursuant to a search warrant. Oliver asserts the agent should not have been allowed to testify about "military photos, uniforms, or that [Oliver] never served in the United States military." He contends that he was "convicted of character assassination," and contends, without citation to any evidence in the record, at the time the trial court ruled on his motion for new trial, that "four (4) active, retired, or reserve service members" sat on the jury in his trial. Even assuming that the agent's testimony could have been excluded, we find that Oliver has not shown that the exclusion of the testimony and photographs would have changed the result of his trial. The "military" evidence "was of negligible importance, and the other evidence of [Oliver]'s guilt was compelling." *Carter v. State*, 310 Ga. 559, 564 (2) (a) (852 SE2d 542) (2020). For the same reason, Oliver cannot meet his burden of proving ineffective assistance as a result of counsel's failure to seek a mistrial based upon admission of the military evidence.

(iii) *Motion to Suppress Search Warrant*. Oliver contends that counsel should

have moved to suppress evidence[5] obtained pursuant to a search warrant because the

warrant was "issued without probable cause," was obtained by deception, and did not

authorize evidence to be forensically examined by the United States Secret Service.

"[W]hen trial counsel's failure to file a motion to suppress is the basis for a claim of

ineffective assistance, the defendant must make a strong showing that the damaging

evidence would have been suppressed had counsel made the motion." (Citation and

punctuation omitted.) *Young v. State*, 309 Ga. 529, 539 (4) (847 SE2d 347) (2020).

Trial counsel testified that he did not file a motion to suppress because there was not

grounds to do so. We agree with counsel's assessment.

> The magistrate's task in determining if probable cause exists to issue a
> search warrant is simply to make a practical, common-sense decision
> whether, given all the circumstances set forth in the affidavit before him,
> including the "veracity" and "basis of knowledge" of persons supplying
> hearsay information, there is a fair probability that contraband or

---

[5] It is difficult to discern from Oliver's brief exactly what evidence he contends should have been suppressed. The only evidence specifically referenced in Oliver's brief is the Secret Service agent's testimony about his forensic examination of Oliver's computers. According to Oliver, the agent's search "found pictures of [Oliver] wearing paint ball fatigues [and] Marine insignia." He also asserts that the agent's testimony "provided in flaming (sic) . . . and bolster[ing] testimony that [Oliver] was never in the military."

28

evidence of a crime will be found in a particular place. . . . The test for probable cause is not a hypertechnical one to be employed by legal technicians, but is based on the factual and practical considerations of everyday life on which reasonable and prudent men act. Moreover, even doubtful cases should be resolved in favor of upholding a warrant.

(Citation and punctuation omitted.) *Taylor v. State*, 303 Ga. 57, 60-61 (2) (810 SE2d 113) (2018). Additionally, "in making the probable cause determination, a magistrate may draw 'reasonable inferences' from the material supplied to him by applicants for a warrant." (Citations and punctuation omitted.) Id. at 61 (2). Oliver's brief contains only bare allegations regarding the lack of probable cause, and our review of the search warrant application and affidavit shows that the warrant was amply supported by probable cause.

With regard to alleged "judicial deception" in obtaining the warrant, "[i]f a court determines that an affidavit contains material false representations or omissions, the false statements must be deleted, the omitted truthful material must be included, and the affidavit must be reexamined to determine whether probable cause exists to issue a warrant." (Citation and footnote omitted.) *Moss v. State*, 275 Ga. 96, 102-103 (13) (561 SE2d 382) (2002). As Oliver fails to identify a specific material false representation or omission in the supporting affidavit, we cannot determine whether

probable cause would have existed in the absence of any such representation or omission. Accordingly, he cannot meet his burden of showing that a motion to suppress would have been granted.

Finally, we find no merit in Oliver's contention that a motion to suppress should have been filed and granted because the search warrant did not authorize a Secret Service agent to conduct a forensic examination of the evidence seized. The warrant expressly authorized a search of the contents of his electronic devices, and the fact that the warrant was addressed to "All Peace Officers of the State of Georgia" does not preclude forensic examination by a person who is not a Georgia peace officer. Cf. *United States v. Gargotto*, 476 F2d 1009, 1014 (6th Cir. 1973) ("Evidence legally obtained by one police agency may be made available to other such agencies without a warrant, even for a use different from that which it was originally taken."); *State v. Motley*, 153 N.C. App. 701, 707 (571 SE2d 269) (NC 2002) (transfer of evidence from one law enforcement agency to another does not constitute an illegal search and seizure).

(d) *Alleged Bolstering*. Oliver asserts that trial counsel should have objected when a district attorney's office investigator testified that Oliver had never served in

the military. In Oliver's view, this testimony "bolstered" the testimony of the Secret Service agent's testimony to the same effect. We disagree.

"It is erroneous for a witness, even an expert, to bolster the credibility of another witness by expressing an opinion that the witness is telling the truth. What is forbidden is opinion testimony that directly addresses the credibility of the victim, i.e., 'I believe the victim; I think the victim is telling the truth.'" (Citations and punctuation omitted.) *Wright v. State*, 327 Ga. App. 658, 661 (2) (a) (760 SE2d 661) (2014). As the investigator's testimony did not address the credibility of the Secret Service agent, trial counsel was not ineffective for failing to make a meritless bolstering objection. Id. at 661-662 (2) (a).

(e) *Specific Cross-Examination Questions Posed by Counsel*. Oliver contends that counsel performed defectively by asking the investigator how she verified Oliver's lack of military service because "he sought to remind the jury in case they missed it the first time" that Oliver had never served in the military. He also complains that trial counsel "opened the door by asking the State's investigator about [Oliver] running for Mayor of Savannah . . . [i]nstead of focusing on [his] innocence." As we have previously explained in Division (4) (b), decisions about what questions

31

to ask on cross-examination rarely constitute ineffective assistance of counsel, and such is the case here. See *Edwards*, 299 Ga. at 24 (2).

5. *Merger*. Based on our holding in Division 1 (a) (iii), Oliver's contention that the trial court should have merged his aggravated stalking and attempted aggravated stalking convictions is moot.

6. *Recidivist Sentence*. Oliver argues that the trial court erred by sentencing him as a recidivist under OCGA § 17-10-7 (a), based upon two convictions in California because the State failed to adequately prove the existence of these convictions or that either would have been felonies under Georgia law. In a related enumeration of error, he asserts that he received ineffective assistance of counsel based on his counsel's failure to prepare for the penalty phase and object at sentencing to the introduction of the prior convictions because they do not exist in his "GCIC" and are not felonies under Georgia law.

OCGA § 17-10-7 (a) provides, in pertinent part:

[A]ny person who, after having been convicted of a felony offense in this state or having been convicted under the laws of any other state or of the United States of a crime which if committed within this state would be a felony and sentenced to confinement in a penal institution, commits a felony punishable by confinement in a penal institution shall

32

be sentenced to undergo the longest period of time prescribed for the punishment of the subsequent offense of which he or she stands convicted, provided that, unless otherwise provided by law, the trial judge may, in his or her discretion, probate or suspend the maximum sentence prescribed for the offense.

In order to determine whether the California convictions could be used to sentence Oliver as a recidivist under OCGA § 17-10-7 (a), we must

> first identify the [California] crime used to enhance [Oliver's] sentence . . . , consider whether the crime is divisible, and then parse the crime's elements using the "formal categorical" or "modified categorical" approach. For guidance in this process, we look to the relevant [California] statutes and case law. After establishing the elements of the [California] predicate conviction, we determine whether those elements would describe a felony under Georgia law.

(Footnote omitted.) *Nordahl v. State*, 306 Ga. 15, 24 (4) (829 SE2d 99) (2019).

In this case, the State alleged in the indictment that Oliver was a "recidivist" with prior convictions in California for "Assault with a Deadly Weapon on a Peace Officer" in 2009 and "Making a Criminal Threat" in 2012. It also provided a "Notice of Recidivist Prosecution" which identified the same convictions, as well as an additional California conviction for "Driving Under Influence Causing Injury." In the sentencing hearing, the State presented certified copies of numerous prior convictions

33

in California, only two of which were admitted for the purpose of supporting a recidivist sentence (assault with a deadly weapon on a peace officer or a firefighter and driving under the influence causing injury). Oliver's counsel objected to other convictions being used for recidivist purposes, and the trial court agreed to use them only for aggravation. He raised no objection to Oliver being sentenced as a recidivist.

Even if we assume, without deciding, that the issues raised by Oliver on appeal for the first time are not waived, *Marshall v. State*, 309 Ga. 698, 704 (3), n.9 (848 SE2d 389) (2020), they have no merit. The State presented certified copies of Oliver's previous convictions, and a comparison of the California offense of assault with a deadly weapon upon a peace officer, Cal. Penal Code § 245 (c), with the Georgia offense of aggravated assault upon a public safety officer, OCGA § 16-5-21 (c), under the appropriate test shows that the California statute describes a felony under Georgia law.[6] Oliver's related ineffective assistance of counsel claim fails because any objection to recidivist sentencing would have been meritless. See *Anderson v. State*, 337 Ga. App. 739, 747 (3) (a) (788 SE2d 831) (2016), disapproved on other grounds, *Nordahl*, 306 Ga. at 19-20 (1), n.8.

---

[6] As it only requires one prior felony conviction to be sentenced as a recidivist under OCGA § 17-10-7 (a), we need not analyze whether Oliver's other California conviction would be considered a felony in Georgia.

7. *Lenity*. Oliver asserts that the trial court erred by failing to apply the rule of lenity to reduce his felony conviction for making a false statement, in violation of OCGA § 16-10-20, to "obstruction of justice," in violation of OCGA § 16-10-24 (a).[7] We disagree.

"The rule of lenity applies when a statute, or statutes, establishes, or establish, different punishments for the same offense, and provides that the ambiguity is resolved in favor of the defendant, who will then receive the lesser punishment. However, the rule does not apply when the statutory provisions are unambiguous." (Citations and punctuation omitted.) *McNair v. State*, 293 Ga. 282, 283-284 (745 SE2d 646) (2013). In *Banta v. State*, 281 Ga. 615 (642 SE2d 51) (2007), the Supreme Court of Georgia rejected the argument that the rule of lenity applies to reduce the felony of making a false statement to misdemeanor obstruction of a police officer because "[s]imply put, the two statutes do not define the same offense" and "are unambiguous." Id. at 617-618 (2).

8. *Special Condition of Probation Regarding Court Filings*. Oliver contends that the trial court erred by entering a "bill of peace" against him without notice and

[7] While Oliver cites no statute for the crime of "obstruction of justice," the only conceivable statute to which he could refer is OCGA § 16-10-24 (a) (obstruction or hindering a law enforcement officer).

in violation of a four-prong test outlined by the Ninth Circuit Court of Appeals in *De Long v. Hennessey*, 912 F2d 1144, 1147-1148 (II) (9th Cir. 1990), and his federal due process rights under the Fourteenth Amendment of the Constitution of the United States. Contrary to Oliver's contention, this Court is not required to follow a federal court decision from the Ninth Circuit. *Bowers v. State*, 151 Ga. App. 46, 49 (258 SE2d 623) (1979).[8] Additionally, the special condition was not a "bill of peace" injunction entered pursuant to OCGA § 23-3-110.[9] Instead, it was a special condition of probation announced by the trial court during the sentencing hearing and imposed in writing at the time Oliver's sentence was entered.

> A trial judge has broad discretion in imposing conditions of probation, and in the absence of express authority to the contrary, there is no reason why any reasonable condition of probation should not be approved. Furthermore, there is a presumption that a sentence was

---

[8] The United States District Court for the Southern District of Georgia advised Oliver that the *De Long* case was not binding in that court *before* he filed his brief in this case. See *Oliver v. Ameris Bank*, No. 4:20-CV-273, 2021 U.S. Dist. LEXIS 150147, at *4 (S.D. Ga. August 10, 2021).

[9] This Code section authorizes a superior court to confirm an established right "[t]o avoid a multiplicity of actions" and grant a "perpetual injunction[ ]." OCGA § 23-3-110. See generally *Rolleston Living Trust v. Kennedy*, 277 Ga. 541 (591 SE2d 834) (2004).

correctly imposed, and the burden of showing that a sentence was not correctly imposed is with the party who asserts its impropriety.

(Citation and punctuation omitted.) *Morgan v. State*, 285 Ga. App. 254, 260 (2) (645 SE2d 745) (2007). See also *Walker v. Brown*, 281 Ga. 468, 469-470 (1) (639 SE2d 470) (2007). Based upon the lack of express authority to the contrary and the reasonableness of the condition imposed by the trial court, we find no merit in Oliver's claimed error in connection with the special condition of his probation.

*Judgment affirmed in part, and reversed in part. Barnes, P. J., concurs. Hodges, J., concurs fully and specially.*

A22A0254. OLIVER v. THE STATE.

HODGES, Judge, fully and specially concurring.

I am constrained to fully concur with the majority opinion, but I write separately to highlight the challenges caused by the venue provision of OCGA § 16-5-90 and to suggest that our General Assembly revisit this law in light of technological advancements since the time of its last amendment.

As the majority correctly states, OCGA § 16-5-90 (a) (1) provides that "the place or places that contact by telephone, mail, broadcast, computer, computer network, or any other electronic device is deemed to occur shall be the place or places where such communication is received." This is a departure from the general rule that, for telephone based crimes, "venue can be either the location from which the call

2

originated or the place at which the call is received." *Reeves v. State*, 346 Ga. App. 414 (1) (a) (816 SE2d 401) (2018). OCGA § 16-5-90 was last amended in 2000, and since then the proliferation of computers and cellular phones has vastly changed the way people communicate with each other. There seems to be no logical reason to impose a more narrow rule for venue for a crime such as stalking, which unlike many other crimes, could often involve a victim and a perpetrator being in different counties from each other during the commission of the crime. I encourage the General Assembly to consider adopting a rule for stalking-based crimes which would permit venue in either the place where the communication originated or where it is received.